**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-517 (CKK)** |
| **KEVIN LOUIS GALETTO** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Kevin Lous Galetto to 27 months of incarceration, the midpoint of the agreed Guidelines range of 24 to 30 months, three years of supervised release, $2,000 in restitution, and a mandatory assessment of $200. A mid-range sentence is warranted because Galetto was one of the first people to enter the Lower West Tunnel and, after being driven out once, reentered the tunnel an hour and a half later. Some of the worst violence on January 6 occurred in the Lower West Tunnel, and Galetto personally participated in the crowd's efforts to overwhelm the officers struggling to hold back the rioters.

I.    **INTRODUCTION**

The defendant, Kevin Galetto, a quality control engineer with a Master's degree who earned a six-figure salary, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote

count, threatened the peaceful transfer of power, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Galetto, then a resident of Southern California, flew from Los Angeles to Washington, D.C., on January 5, 2021, to attend the "Stop the Steal" rally at the Ellipse on January 6. After the rally, Galetto went to the West Front of the United States Capitol, arriving between 2:00 p.m. and 2:40 p.m. When rioters overran the police line in the West Plaza at 2:28 p.m., the Metropolitan Police Department (hereinafter, "MPD") and United States Capitol Police Officers (hereinafter, "USCP") who had been holding the line retreated to the Lower West Tunnel. At 2:40 p.m., Galetto was one of the first rioters to enter and advance against the police line inside the tunnel. Galetto pushed against one of the officers and tried to take his riot shield. Galetto left the tunnel and then re-entered it around 4:15 p.m. and was part of one of the last pushes against officers who were attempting to hold the tunnel.

The government recommends that the Court sentence Galetto to 27 months of incarceration for his multiple convictions, including a violation of 18 U.S.C. § 231(a)(3), which is within the Guidelines' range of 24-30 months, the range agreed to in the plea agreement and recommended

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

in the PSI. A 27-month sentence reflects the gravity of Galetto's conduct but also acknowledges his plea and acceptance of responsibility.

## II.   FACTUAL BACKGROUND

### A.   The January 6, 2021 Attack on the Capitol

The government refers the court to the Statement of Offense in this case, ECF 56, for a summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.   The Assault on Police in the Lower West Tunnel

Galetto's assault on police officers occurred in one of the most violent confrontations that took place on January 6, in an area known as the Lower West Tunnel, which is located on the Lower West Terrace. The tunnel entrance usually consists of a flight of stairs leading to a doorway. On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long.   That tunnel led to two sets of metal swinging doors inset with glass.   On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building.   The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building.   This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day.   How the Lower West Tunnel usually appears on Inauguration Day is shown below in an image provided by the Architect of the Capitol.



On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.   USCP officers, assisted by MPD officers, were arrayed inside the doorway guarding the entrance.   Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 p.m., rioters broke the windows to the first set of doors inside the Lower West Tunnel, and police officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist.   The mob continued to grow, and the rioters pushed their way into the second set of doors, attacking police with batons, poles, chemical spray, bottles, and other items.   Officers created a line in the doorway to block the rioters and fought back with batons and OC spray.   At a later hearing on the events of January 6, Congresswoman

Stephanie Murphy described her experience near this location in response to testimony from MPD

Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer
> of power, and it was an attack on this Capitol building, but it was also an attack on
> real people.   And most people don't know this -- and I don't think even you know
> this -- but your actions had a profound impact on me.   So, at 3:00 p.m. on January
> 6th, 2021, while you were holding back the mob at the Lower West Terrace
> entrance, I was holed up with Congresswoman Kathleen Rice in a small office
> about 40 paces from the tunnel that you all were in.   That's about from the distance
> where I'm sitting here on the dais to that back wall.   And from that office in close
> proximity to where you all held the line, I listened to you struggle.   I listened to
> you yelling out to one another.   I listened to you care for one another, directing
> people back to the makeshift eyewash station that was at the end of our hall.   And
> then, I listened to people coughing, having difficulty breathing, but I watched you
> and heard you all get back into the fight."   Testimony of USCP Sgt. Gonell, MPD
> Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before
> the House Select Comm. to Investigate the January 6th Attack on the United States
> Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy)
> *available   at*   https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-
> january-6-attack.

The violent and physical battle for control over Lower West Tunnel and the Terrace beyond it

continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed,

and beat police officers.   This battle involved intense hand-to-hand combat, and some of the most

violent acts against police, including the abduction and tasering of MPD Officer Michael Fanone

and the previously mentioned assault of Officer Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of

objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a

concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification,

and overturn the election results by force.   USCP Sergeant Aquilino Gonell, who was present in

the tunnel that day, explained:

> What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle.   *Id.*

Despite the mob's efforts, the officers held the line with commendable restraint, through personal sacrifice and valor.   MPD Officer Fanone remembers one of his colleagues' actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers. "Hold the line," he shouted over the roar. Of course, that day, the line was the seat of our American government. Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life. The bravery he and others showed that day are the best examples of duty, honor, and service.   *Id.*

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5:00 p.m.

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area.   It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including potential harm to members of Congress.

Galetto directly and indirectly assaulted police officers in the Lower West Tunnel. He did so during a sustained mass resistance against officers in what was one of the most violent locations and times during the Capitol Riot. Galetto's participation in the battle for the Lower West Tunnel

provides important context when weighing the sentencing factors in this case.

### C.    Galetto's Role in the January 6, 2021 Attack on the Capitol

*1. Galetto's Preparation for January 6 and Route to the Lower West Tunnel*

Galetto began preparing to travel to Washington, D.C., on December 28, 2020. He coordinated his travel and lodgings with another individual (hereinafter, "Individual 1"). Also on December 28, Galetto texted a group of friends, "Time to fight for our freedom." Between December 28, and December 31, 2020, Galetto and Individual 1 discussed flights from Los Angeles to D.C. and where to stay. After booking their travel arrangements, Galetto and Individual 1 began to plan their on-the-ground activities in Washington. On January 3, 2021, Individual 1 inquired if Galetto had a pair of "walkie-talkies" to use if they encountered difficulty communicating via cell phone. Approximately two hours later, Galetto informed Individual 1 that he "picked up walkie-talkies 16 mile range with several channels (24x120 subchannels) has lots of bells and whistles. Should be good to go." On January 4, 2021, Galetto and Individual 1 met in person at Galetto's home to discuss their plans for January 6.

Galetto and Individual 1 arrived in Washington on January 5, 2021, and stayed at the St. Gregory Hotel on M Street Northwest. On the morning of January 6, 2021, Galetto and Individual 1 attended the "Stop the Steal" rally at the Ellipse but became separated. At 2:04 p.m.,[2] Galetto sent a picture of the Capitol taken from Pennsylvania Avenue, that shows the crowd moving in the

---

[2] Galetto's phone shows these text messages as being sent three hours before he sent them. This is due to the difference between the time zone where Galetto was when he sent the message, Eastern Standard Time, and where the phone was when it was seized and searched, Pacific Time.

direction of the Capitol.



*Image 1.*

Galetto began coordinating with Individual 1 to try and relocate each other. Galetto sent Individual 1 two photographs and described his location. At approximately 2:10 p.m., Galetto texted, "I am by the huge Trump banner." He then sent a photo of the crowd. Galetto next sent a text message to Individual 1 announcing that he had "breached the WH."[3] Shortly thereafter, Galetto sent a photo of the West Front of the Capitol taken from the area near the Peace Circle and the Pennsylvania Walkway on the north side of the West Lawn, connecting the steps of the Capitol with 1st Street NW and Pennsylvania Avenue NW. Galetto's photograph shows the amassed

---

[3] Galetto consistently referred to the United States Capitol Building as the White House.

crowds on the West Front.



*Image 2.*

Between when he sent the photograph to Individual 1 and 2:41 p.m., Galetto continued to advance up the West Front of the Capitol. As Galetto was making his final approach to the Capitol, a series of events happened on the West Front in rapid succession. At 2:08 p.m., the mob of rioters breached the Upper Northwest Stairs, giving them access to the Northwest Courtyard and the path to the Senate Wing Door, which was breached five minutes later itself at 2:13 p.m. At 2:28 p.m., rioters overwhelmed the police line in the West Plaza. Between 2:28 p.m. and 2:41 p.m., the officers on the West Front retreated up the West Stairs to the Lower West Terrace and ultimately into the Lower West Tunnel. At the same time, the mob also continued up the West Front in pursuit of the retreating officers with some rioters assaulting the officers as they retreated. Inside of the Lower West Tunnel, the officers secured a set of glass doors against the rioters. At 2:42 p.m., rioters began to break through the locked glass door that the officers had secured. From behind a second set of swinging doors, the officers watched as the glass separating them from the rioters

shattered and the rioters were able to pass further into the Lower West Tunnel.

### 2. *Galetto's Activities in the Lower West Tunnel*

One minute prior to a rioter shattering the glass in the Lower West Tunnel door, at 2:41 p.m., Galetto, dressed in a brown work jacket, gray hoodie, yellow gloves, black beanie with "GROUND ZERO" printed on it, and a blue Trump-branded hat, entered the mouth of the tunnel.



Galetto was the fifth rioter to enter the tunnel and did so immediately after watching a group of officers go into the tunnel ahead of him while continuing to use non-lethal munitions to disperse the advancing rioters, including Galetto. Once he crossed the threshold into the tunnel, Galetto turned to the crowd behind him and then back to the door. Facing the door again, Galetto raised his hand, pointed at the door, and shouted before continuing to advance with the crowd to

the door and the officers behind it.[4]



From his position towards the head of the crowd, Galetto watched from mere feet as the rioters broke through the glass. Officers standing on the other side of the door used a body worn camera to film the rioters as they smashed the glass panes of the door using a flagpole and what

---

[4] The image showing Galetto point to the door and shouting has been brightened.

appears to be the butt of a knife.[5]



*Ex. 2.1.*                    *Ex. 1.*

While other rioters around him celebrated, Galetto watched the glass shatter. Once the doors were

fully breached, Galetto was one of the first rioters to advance towards the police line and was

among the first few rows of rioters to confront the officers in the tunnel.

One of the officers who now found himself facing a riotous mob in an extremely confined

space was MPD Officer B.S. When the mob smashed through the glass and breached the doors in

the tunnel, Officer B.S. lifted a shield and advanced against the mob to prevent them from moving

further into the tunnel. He was one of the frontline officers in the Lower West Tunnel who bore

the brunt of the weight of the mob during its first push against the line of officers. Officer B.S.'s

body worn camera captured Galetto as he made his way to the head of the crowd. However, even

before he was at the head of the mob in the tunnel, Galetto was pushing against the other rioters

---

[5] The government has determined that, despite the six second timestamp difference, the body worn camera and Capitol CCV shown above depict the nearly same instant. The CCV camera actively shakes and angles upwards as the rioters bang on the door and ultimately smash the glass. *See* Ex. 2.1 at timestamp 01:59. The body worn camera shows that the rioters shattered the glass as the flagpole strikes the glass for the third time. *See* Ex. 1 at timestamp 0:46.

who were themselves pushing against the officers. Therefore, even though it took Galetto approximately one minute to make direct contact with any officer, he previously added his weight and strength to the total force of the mob that was pushing against the officers.

At 2:43 p.m., another rioter moved out of the way and Galetto reached around him to grab Officer B.S.'s shield.



*Ex. 3.2.*

Having made this initial contact with Officer B.S.'s shield, Galetto reached both of his hands up and began to push against the shield and Officer B.S. For two minutes, Galetto was in direct contact and pushing Officer B.S., who had to hold back both Galetto and the force of the entire crowd pushing behind Galetto and thus exerting a cumulative weight against Officer B.S.

Even when a space in the crowd opened behind Galetto and gave him an opportunity to move back from the front line of the scrum in the tunnel, he did not attempt to back away from the line of officers, leave the tunnel, or even break contact with Officer B.S. Instead, Galetto turned

back to face the crowd while leaving his elbow in contact with the officer's shield.



*Ex. 3.2*

When the gap behind him closed again, Galetto turned his body such that his back was facing against Officer B.S., and he continued to push against Officer B.S. and the other officers in the line. As a result of the continued force being applied against him by Galetto, as well as the general jostling and force of the crowd, Officer B.S. collapsed to the ground. Galetto, too, fell to

14

the ground and can be seen kneeling over Officer B.S.[6]



*Ex. 3.2.*

In this position, Officer B.S. faced an extremely high risk of being crushed underfoot of the rioters and the other officers in the tunnel. This risk was apparent to many people in the tunnel because a rioter can be heard yelling, "Get this cop up! We got a man down!" Galetto, despite being less than an arm's length away from Officer B.S., did not offer any assistance. Officers B.S., after being knocked over by Galetto and the crowd, remained on the floor of the Lower West Tunnel and underfoot of the rioters and officers for approximately two minutes and repeatedly called out for help. *See* Ex. 3.2 at timestamp 02:33-04:22. Officer B.S. was only able to stand back up after another officer stepped over him to provide cover and, after he called out for help, had to be assisted back to his feet by other officers because of the crush of the mob. Galetto remained in

---

[6] The PSR recounts Galetto's claim that, in this moment, he was "kneeling over [Officer B.S.] trying to keep my weight and the crowd from crushing him. I asked him if he was ok." ¶ 38. The government notes that, while this may not be entirely inconsistent with what the body worn camera shows, Galetto does not appear to ask Officer B.S. if he is okay. Moreover, Galetto's body is positioned a significant enough distance away from Officer B.S. that any claim that Galetto was protecting him strains credulity.

the tunnel for approximately five more minutes before exiting along with several other rioters. As he exited the tunnel, Galetto, while signaling into the tunnel with his hand, yelled out to the crowd, "More people!" *See* Ex. 5 at timestamp 0:29.



*Ex. 5*                    *Ex 2.2*

A sustained struggle between the rioters and police officers in the Lower West Tunnel continued from 2:51 p.m., when Galetto first exited the tunnel, to 4:15 p.m. Some of the worst violence against police officers occurred during this period and at this location. For hours, rioters continued trying to breach the police line protecting the tunnel and the Capitol beyond it. One of the methods adopted by the rioters was synchronized pushing against the officers. Rhythmically yelling "Heave! Ho!" as their signal and often locking arms with each other, the rioters would move backwards in unison before rocking and pushing forward in a synchronized movement. The result of this synchronization was that the officers in the tunnel had to sustain the whole weight of the rioters moving forward against them at once. As the rioters were making these synchronized

16

assaults on the officers, Galetto entered the Lower West Tunnel a second time at 4:15 p.m.



*Ex. 6.*

Over the span of approximately four minutes, Galetto pushed and maneuvered his way towards the front of the crowd in the Lower West Tunnel. During this time, Galetto participated in the coordinated efforts of the crowd to overwhelm the officers.[7]



*Ex. 6.*

At approximately 4:20 p.m., the officers in the Lower West Tunnel made a coordinated

---

[7] The image showing Galetto's efforts against officers at approximately 4:19 p.m. in the Lower West Tunnel has been brightened.

push against the rioters, who, over the four minutes that Galetto was in the tunnel, had pushed the officers far back into the tunnel. The coordinated efforts of the officers to advance inside of the tunnel caused the rioters, including Galetto, to be pushed toward the mouth of the tunnel. As the mob was pushed backward, Galetto, who was continuing to push on the rioters surrounding him in an effort to resist the officers, was moving backward. Galetto was unsuccessful in his efforts and, upon walking backward over the edge of the stairs immediately outside of the tunnel, fell.



*Image 3.*

### 3. *Galetto's Activities After the Capitol Riot*

After leaving the area around the Lower West Tunnel, Galetto described his activities at the Capitol to others via text messages throughout the evening. Between 7:00 p.m. and 9:00 p.m., he sent several text messages to various individuals. Those text messages stated, in relevant part:

> I was at the front of the attempted breach. […] After Pence turned, croud (*sic*) was pissed-off.

> We fought hard today, made history. Sore as he'll (*sic*). Was fighting

with police.

History. These politicians need to be overthrown. Pence is a trader (*sic*) [...] Very sore. Was in the front line. [...] Pence broke the last straw. [...] Thanks, we're done as a free country.

Individual 2: Did you meet up with friends? Did you feel your participation was useful? Did you enjoy the experience? Were you worried about possibly being harms (*sic*) way? Did you get in any trouble legally or physically? Etc.
Galetto: Yes, it got physical and we were all pepper sprayed tear gassed and beaten with clubs, fists, etc.
Individual 2: YOU were beaten, too!?!? Holy shit, you were right in the fray it sounds like!
Galetto: Yep.
Individual 2: Wow! Well like I said, I'm glad you're safe now. Did you get arrested?
Galetto: Not yet. They are running facial recognition [software] to locate those involved. FB, Twitter, Google, etc. Are cooperating with the Chinese and our Treasonous government.

## II.     THE CHARGES AND STIPULATED TRIAL

On April 23, 2021, Galetto was arrested on a criminal complaint, and a grand jury ultimately returned a Second Superseding Indictment. On March 20, 2023, Galetto pled guilty to Count One, charging impeding officers during a civil disturbance, in violation of 18 U.S.C. § 231(a)(3), and Count Three, charging assault of a government official, in violation of 18 U.S.C. § 111(a), of the Second Superseding Indictment.

## III.     STATUTORY PENALTIES

On Count One, Galetto faces a maximum five-year imprisonment term, a three-years of supervised release term, and a mandatory $100 assessment. On Count Three, Galetto faces a maximum eight-year imprisonment term, three-years of supervised release term, and a $100 special assessment. The maximum fine is $250,000 or twice the offense's pecuniary gain or loss.

## IV. THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The appropriate offense level computations for Counts One and Three, before any grouping analysis under Part D of Chapter 3 or any credit for acceptance of responsibility are:

### Count One: 18 U.S.C. § 231(a)(3) – Civil Disorder

| | | |
|---|---|---|
| Base Offense Level | 10 | U.S.S.G. § 2A2.4(a) |
| Specific Offense Characteristic – Physical Contact | +3 | U.S.S.G. § 2A2.4(b)(1): "the offense involved physical contact." |
| Total | 13 | |

**Count Three: 18 U.S.C. § 111(a)(1) – Assaulting, Obstructing, Interfering, or Impeding Certain Officers[8]**

| Base Offense Level | 10 | U.S.S.G. § 2A2.4 |
|---|---|---|
| Specific Offense Characteristic – Physical Contact | +3 | U.S.S.G. § 2A2.4(b)(1): "the offense involved physical contact." |
| Cross-reference: | 14 | U.S.S.G. § 2A2.4(c)(1): "If the conduct constituted aggravated assault, apply § 2A2.2 (Aggravated Assault)." <br><br> U.S.S.G. § 2A2.2, cmt. n.1(D) defines "Aggravated assault" to include "a felonious assault that involved … (D) an intent to commit another felony." Here, that other felony is the 18 U.S.C. 231(a)(3) offense in Count One. |
| Specific Offense Characteristic – Official Victim | +6 | U.S.S.G. § 3A1.2(b): "If the victim was a government officer or employee" then "increase by six levels." |
| Total | 20 | |

Because the victim of both offenses was a police officer, they form a single "group." U.S.S.G. § 3D1.2(a) and (b). The offense level for the group is 20. U.S.S.G. § 3D1.3. Because Galetto waived his right to a jury trial and pled guilty, the government does not oppose a three-level downward adjustment for acceptance of responsibility, under U.S.S.G. § 3E1.1(a) and (b), yielding an offense level of 17. The U.S. Probation Office calculated Galetto's criminal history as category I, which is not disputed. PSR ¶ 59. Accordingly, without any additional variances or departures, the appropriate range is 24 to 30 months.

---

[8] In the plea agreement, the government made a typographical error and referred to the guidelines for count three as "U.S.S.G. § 2B2.2" rather than §2A2.2. The calculations were otherwise correct aside from the reference to §2B2.2, which is not a section in the United States Sentencing Guidelines.

The government believes that a mid-point imprisonment sentence of 27 months, three years of supervised release, restitution of $2,000 and a mandatory assessment of $200 is appropriate. This sentence reflects the severity of Galetto's conduct in the Lower West Tunnel on January 6, but also acknowledges his acceptance of responsibility and remorse for his conduct that day.

## V.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of an imprisonment term at the midpoint of Galetto's sentencing guidelines range.

### A.     Nature and Circumstances of the Offense

As shown in Section II of this memorandum, Galetto's conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The attack on the Capitol was a norm shattering event that, by its very nature, defies comparison to other events in American history much less isolated instances of criminal behavior by individuals.

While each defendant should be sentenced based on his or her individual conduct, each

22

individual person who entered the Capitol and assaulted police on January 6 did so under the most extreme circumstances and their conduct directly contributed to those circumstances.   As a person entered the restricted area around the Capitol, they would—at a minimum—have passed numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed extensive fighting with police.

The nature and circumstances of Galetto's crimes weigh in favor of a 27-month imprisonment term. Galetto travelled from California to Washington, D.C., on January 6, 2021. He attended the rally at the Ellipse before walking with the crowd to the Capitol. At the Capitol, he made his way to the front of the crowd and, at 2:41 pm., entered the Lower West Tunnel where he twice physically engaged with officers, both directly and indirectly. As stated above, Galetto was at the head of the mob of rioters who first entered the Lower West Tunnel, had seen officers retreating into the tunnel, and watched as rioters smashed through the glass to get inside where officers were located. Galetto then directly engaged with the officers and assaulted Officer B.S., ultimately causing him to fall to the ground where there was a very real possibility that he would a suffer potentially severe injury under the feet of the rioters and officers in the narrow tunnel. Officer B.S. avoided this injury only when another officer placed his own body in between Officer B.S. and the rioters, allowing Officer B.S. the room necessary to stand up with assistance from his fellow officers.

That Galetto reentered the tunnel for a second time is significant. At the time that Galetto reentered the tunnel at 4:15 p.m., he had personal knowledge of what was happening in the Lower

West Tunnel. Indeed, the PSR recounts Galetto's claim that he was trying to shield Officer B.S. with his body when they both fell. ¶ 38. If that is to be believed then, Galetto was acutely aware of the dangers inside of the tunnel and, at a minimum, was aware that the police officers in the tunnel were not passively resisting the rioters' efforts to breach the tunnel. Galetto went into this fray for a second time knowing full well that he was going to confront police officers inside of the tunnel and that his actions would place police officers at a direct risk of harm. The knowing risk that Galetto took entering the Lower West Tunnel for a second time should not be overlooked or minimized in any way. This factor cuts heavily in favor of a 27-month term of incarceration, the midpoint of Galetto's sentencing range.

### B.  Galetto's History and Characteristics

Galetto has no criminal convictions and has never been arrested. For his entire adult life, Galetto has been a contributing member of society. Moreover, by entering his plea of guilty, Galetto has acknowledged the unlawfulness of his conduct. Galetto further acknowledged to Probation that his conduct was unlawful. PSR ¶ 38. For this reason, the government believes that a midpoint sentence, rather than a high-end sentence, is appropriate in this case.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law.

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Galetto's conduct on January 6 was the epitome of disrespect for the law and our constitutional process. When Galetto twice entered the Lower West Tunnel, he made an active decision to physically engage with police in what some of those officers have characterized as a "medieval battle." *See*, *e.g.*, Peter Herman, *'We got to hold this door'*, WASHINGTON POST, January

24

14, 2021, *available at* https://www.washingtonpost.com/dc-md-va/2021/01/14/dc-police-capitol-riot/?arc404=true.

Galetto was not a passive participant in this conduct: he was at the head of the line for his first foray into the tunnel and readily engaged with the mob's synchronized pushing against officers for his second foray. It was not, however, just his conduct against police officers that showed his disrespect for the law, it was also the reason that he undertook those violent acts: to stop the peaceful transition of power. Galetto, as a member of that mob, was not merely disrespecting the law, he was an active participant in an attack on the bedrock principle of our republic. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that this violent conduct and the motives that underlie it are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

D.     **The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[9] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

---

[9] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant weighs in favor of a term of incarceration at the midpoint of the applicable Guidelines range. Galetto's conduct on January 6, 2021, particularly his decision to enter the tunnel for a second time, shows that he needs to be specifically deterred from engaging in this sort of conduct again. Galetto, despite having personal knowledge of what was happening the Lower West Tunnel and the dangers that the police officers in the tunnel faced, readily reentered the tunnel and engaged with them for a second time. He is, plainly, not someone who is easily deterred by the facts laid before him. A midpoint sentence would provide specific deterrence to Galetto.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing

philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[10]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[11]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

---

[10] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[11] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

factors present here, the sentences in the following cases[12] provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Sargent*, 21-cr-258 (TFH), the defendant watched as police officers were being assaulted on the West Front and chose to move himself to the front of the crowd as the officers were retreating from the West Plaza to the West Terrace. Having maneuvered his way to the front of the skirmish line on the West Front, the defendant assaulted a USCP officer. Sargent pled guilty to violating 18 U.S.C. § 231(a)(3), 18 U.S.C. § 111(a)(1), and 18 U.S.C. § 1752(a)(1) and (2). Judge Hogan sentenced the defendant to 24 months' incarceration.

In *United States v. Joshua Lee Hernandez*, 22-CR-42 (CRC), the defendant breached the Capitol and then, in a coordinated push with other members of the mob, moved a group of police officers away from the Memorial Door, thus allowing the mob outside the doors to begin flowing into the Capitol. Later, he assaulted a police officer with a flagpole. The defendant pled guilty to violating 18 U.S.C. § 231(a)(3), 18 U.S.C. § 111(a)(1), and 18 U.S.C. § 1752(a)(1) and (2). Judge Cooper sentenced Hernandez to 24 months of incarceration.

Both *Sargent* and *Hernandez* bear key similarities. First, both involved defendants who willingly inserted themselves into a hostile situation and, in that situation, assaulted police officers. Second, both defendants acknowledged their guilt and entered pleas to violations of 18 U.S.C. § 231(a)(3) and 18 U.S.C. § 1512(c)(2). In *Sargent*, the defendant, having seen the assaults on police officers, went out of his way to get to the front of the line and assault police officers who he felt

---

[12] In addition to the two cases described in detail, the government directs the court to the cases of *United States v. Nolan Cooke*, 22-CR-52 (RCL), and *United States v. Moises Romero*, 21-CR-677 (TSC). In both of these cases, the defendants pled to the sole count of violating 18 U.S.C. § 231(a)(3) and, within a guidelines range of 8 to 14 months, received above midpoint sentences of 366 days.

were standing in the way of the mob's desired objective. In *Hernandez*, the defendant participated in a coordinated effort by a group of rioters to overwhelm police officers who were trying to prevent additional rioters from breaching the Capitol. While no one case is a perfect comparator, Galetto's intent and actions on January 6, militate in favor of at least a midpoint sentence to reflect both the severity of his conduct and his acceptance of responsibility.

## VI.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted).

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was

reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court ... may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").]

More specifically, the Court should require Galetto to pay $2,000 in restitution for his convictions.   That amount fairly reflects Galetto's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, $2,000 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

**VII.   CONCLUSION**

For the reasons set forth above, the government recommends that the Court impose a sentence of 27 months of incarceration, three years of supervised release, restitution of $2,000, and a mandatory assessment of $200.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:      _s/ Sean P. McCauley_____
SEAN P. McCAULEY
Assistant United States Attorney
New York Bar No. 5600523
United States Attorney's Office
For the District of Columbia
601 D. Street, NW
Washington, DC 20530
Sean.McCauley@usdoj.gov