## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

United States of America,  :

          :      **Case No.:**

     v.    :     1:21-cr-00517-CKK

Kevin Louis Galetto,   :

    Defendant. :

_____

## SENTENCING MEMORANDUM ON BEHALF OF KEVIN GALETTO

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  FACTUAL BACKGROUND ............................................................................... 2

   A.  Mr. Galetto's background, family, employment history, and character ..................... 2

   B.  The events leading up to and on January 6, 2021 ................................................ 7

   C.  Indictment, Conviction, and Guidelines Range Calculation ........................... 10

III.  ARGUMENT .................................................................................................. 13

   A.  Legal Standard ............................................................................................... 13

   B.  The § 3553(a) Factors Favor a Downward Variance ..................................... 14

     1. The nature and circumstances of the offense ............................................. 15

     2. Mr. Galetto's personal history and characteristics .................................... 18

     3. The general purposes of sentencing ........................................................... 18

     4. The need to avoid unwarranted sentencing disparities ............................... 20

   C.  Zero-Point Offender Amendment .................................................................. 26

   D.  No fine should be imposed ............................................................................. 28

   E.  No supervised release is necessary ................................................................ 28

   F.  Mr. Galetto requests the Court permit him to self-surrender ......................... 29

IV.  CONCLUSION ................................................................................................ 30

## I.      INTRODUCTION

Kevin Galetto, through undersigned counsel, files this Sentencing Memorandum requesting this Honorable Court to determine a sentence sufficient but not greater than necessary to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a). Mr. Galetto has made no excuses for his conduct on January 6, 2021. He is remorseful and has accepted full responsibility for his actions, and as such, pled guilty pursuant to a written Plea Agreement (ECF 57). Per that Agreement, Mr. Galetto pled guilty to Count 1: Civil Disorder (18 U.S.C. § 231(a)(3)) and Count 3: Assaulting, Resisting, or Impeding Certain Officers (18 U.S.C. § 111(a)(1)). The government agreed to dismiss all other pending charges.

Per the Presentence Investigation Report ("PSR") (ECF 61), Mr. Galetto's offense level is 17, his criminal history category is I, and his guideline range of imprisonment is 24-30 months imprisonment (PSR, paras. 56, 59, 88).[1]

Section 8 of the Plea Agreement permits either party to seek a variance outside of the applicable guidelines range, based upon the factors to be considered in imposing a sentence pursuant to 18 U.S.C. § 3553 (a). After an analysis of the § 3553 (a) factors, Mr. Galetto's acceptance of responsibility in this case, and other issues related to the Sentencing Guidelines addressed below, Mr. Galetto asks the Court to vary below the guideline range and sentence him to a period of incarceration of six months or less. Mr. Galetto requests that he be permitted to self-surrender and be housed at the Federal Correctional Institution Coleman in Sumterville, Florida.

---

[1] While technically accurate and in conformity with the Plea Agreement, the PSR calculation does not include a two (2) point reduction in the offense level for Mr. Galetto meeting the criteria of a "zero-point offender". Please see the discussion, *infra*, III.C.

## II.     FACTUAL BACKGROUND

### A.  Mr. Galetto's background, family, employment history, and character

Kevin Galetto was born on March 18, 1960, in Montrose, Pennsylvania, to Louis Galetto and Joanne Smith (PSR, para. 65). He had a good childhood growing up with his three sisters in rural upstate New York (PSR, paras. 66-67) and remains close with all of them. His parents divorced when he was in high school, and while he lost contact with his father for several years, they reconnected before his father passed away on December 12, 2012 (PSR, paras. 65, 67). Mr. Galetto has always been and still is close with his mother (PSR, para. 67).

He has been married to Milagros Galetto for 22 years (Exhibit A, Letters to the Court in Support of Kevin Galetto, Letter from Milagros Galetto). Mr. Galetto and Milagros are life partners, who have only each other to lean on and support one another (Exh. A: Letter from Milagros Galetto). They have not been blessed with children (Exh. A: Letter from Milagros Galetto).

Milagros was diagnosed with cancer in 2016, resulting in the removal of one tonsil (Exh. A: Letter from Milagros Galetto). Mr. Galetto drove Milagros to follow-up exams two hours from their home for two years (Exh. A: Letter from Milagros Galetto; *see also*, Letter from Dominic Cortella). In 2019, doctors discovered the cancer had returned and spread to the lymph nodes, requiring chemotherapy and radiation treatments every weekday for two months (Exh. A: Letter from Milagros Galetto). Mr. Galetto drove Milagros to every appointment, stayed with her throughout the treatments, and physically took care of her (Exh. A: Letter from Milagros Galetto). Milagros "could not have survived without the assistance" of Mr. Galetto (Exh. A: Letter from Milagros Galetto). Unfortunately, doctors recently noticed a large nodule in a chest scan and Milagros has a follow-up appointment at the end of August (Exh. A: Letter from Milagros Galetto).

2

Milagros is heavily dependent on Mr. Galetto for his assistance, support, and care (Exh. A: Letter from Milagros Galetto).

After graduating high school and a brief period at college, Mr. Galetto entered the workforce, joining IBM for approximately one year. He subsequently worked for several companies in the technical and quality process engineering area, and eventually continued his education, earning his Bachelor of Science in Business Management in 2002 by attending night school (PSR, para. 75). He subsequently earned a Master of Business Administration in 2014 (PSR, para. 75), becoming the first person in his family to earn a Master's degree. Mr. Galetto bought and completely renovated a house by himself in San Jose, California, which contributed to the revitalization of the neighborhood. He sold that house and moved to the greater Los Angeles area, where he worked and lived for 21 years. He retired shortly after his arrest in April 2021, (PSR, para. 77) and moved to Florida (PSR, para. 70).

Mr. Galetto is a kind, generous, and hard-working family man, who gives his time and energy in the service of others. Numerous friends, family, and colleagues provided character letters that speak to the honest, law-abiding, model citizen that Mr. Galetto has shown himself to be throughout his 63 years (Exhibit A, Letters to the Court in Support of Kevin Galetto).

Mr. Galetto has always been a "respected individual" in his family, community, and each church in which he has been a member and has given countless hours of his time to help people in need (Exh. A: Letter from Norberto Ferrer; Letter from Stephen Bott; Letter from Dennis J. Plymale). At his current church (Life Church, Spring Hill, Florida), Mr. Galetto volunteers his time to drive, load, and unload a food truck to distribute food to those in need and to help facilitate a food pantry (Exh. A: Letter from Roberto Michel; Letter from Julio D. Larregui; Letter from Evelyn Garrett; Letter from Donald G. Brothers). Mr. Galetto does this three (3) days a week,

usually for four hours at a time. He also helps around the church grounds, planting flowers, power washing the sidewalks, cooking food, building a form for a concrete walkway at the church, and performing necessary maintenance (Exh. A: Letter from Roberto Michel; Letter from Evelyn Garrett). At his previous church, Cottonwood (Los Alamitos, California), which Mr. Galetto began attending in 2008, he actively participated in the "Helps Ministry", which assisted the elderly, single mothers/widows, the physically disabled, and others in need by repairing homes, garages, and roofs, doing yardwork, and other chores (Exh. A: Letter from Greg Hilgen; Letter from Steve Nielsen; Letter from David Carter; Letter from John Zabukovec; Letter from Dennis J. Plymale; Letter from James George; Letter from James Smith). Mr. Galetto also joined the Helps Ministry in trips abroad to build churches and homes following natural disasters in 2010 (Exh. A: Letter from Greg Hilgen). He was "selfless in his service and would have no hesitation using his own money to help" (Exh. A: Letter from Steve Nielsen) and was one of the "most trusted volunteers and leaders" (Exh. A: Letter from John Zabukovec). Mr. Galetto would receive unsolicited compliments for his generosity and the quality of his work (Exh. A: Letter from John Zabukoevc). The pastor at his current church looks forward to seeing Mr. Galetto's good works and fruitful results again soon (Exh. A: Letter from Roberto Michel).

A colleague and friend highlighted Mr. Galetto's skill as a handyman after Mr. Galetto volunteered his time to renovate the colleague's master bath, kitchen, and air conditioning system (Exh. A: Letter from Greg Hilgen). Another friend recalled Mr. Galetto helping fix a broken heater despite dealing with a loss in his family at the same time (Exh. A: Letter from Steve Nielsen).

Mr. Galetto's supervisor, Dominic Cortella, stated that he was well-liked and respected at work (Exh. A). A former colleague, Greg Hilgen, indicated that he and Mr. Galetto developed a long-term friendship that he hopes will continue for the rest of their lives (Exh. A). Mr. Hilgen

considers Mr. Galetto a "true Friend and Brother" and highlighted many great times and memories they had spending time together (Exh. A). Another former colleague, Roland L. Verdugo, respected Mr. Galetto for his professional knowledge and found him to be a good man and valued employee (Exh. A). Mr. Galetto was known to have improved work processes and the general work environment (Exh. A: Letter from James George). Mr. Galetto created lunch-time bible study groups at two different companies.

On January 6, 2021, Mr. Galetto was motivated by his sense of patriotism and loyalty and love for his country (Exh. A: Letter from Dominic Cortella; Letter from Evelyn Garrett; Letter from Dennis J. Plymale; Letter from James George). He has respect for the military, police, government, and laws of the United States (Exh. A: Letter from James Smith).

The letters of support provided to This Honorable Court by Mr. Galetto's friends, family, and colleagues paint a picture of a kind, caring human being who spent his life shining His light and helping others in need (Exh. A):

- "a hard-working man, and he is very religious" (Letter from Dennis J. Plymale);

- "well respected and admired" (Letter from Dennis J. Plymale);

- "he just enjoys helping people with the skills he possesses that they may not have" (Letter from Dennis J. Plymale);

- "I have always found Mr. Galetto to be a law-abiding citizen" (Letter from Dennis J. Plymale);

- "a person of integrity" (Letter from Stephen Bott);

- "an intelligent, thoughtful and caring man" (Letter from James Smith);

- "he would do anything for someone in need and has frequently offered to drop everything and help" (Letter from James Smith);

- "how kind, thoughtful, honest, generous he is and his heart and concern for our coworkers, friends, neighbors and others" (Letter from Greg Hilgen);

- "a forever friend" (Letter from Greg Hilgen);

- "he is kind…he is generous with his time and money…he is honest and law abiding" (Letter from Greg Hilgen);

- "extremely generous with his time and skills" (Letter from John Zabukovec);

- "trustworthy, skilled and good with people…and outstanding leader" (Letter from John Zabukovec);

- "a hard-working, honest man; liked and respected by anyone at church or [Bible Study Fellowship] that knew him" (Letter from James George);

- "a law-abiding God-fearing man" (Letter from David Carter);

- "impressed with the way he handles himself in such a calm and professional manner" (Letter from Roland L. Verdugo);

- "always impressed me with his friendliness, the desire to 'do the right thing', willingness to help others and contribute to the needs of the neighborhood" (Letter from Paul Murphy);

- "a man of his word and a man of integrity" (Letter from Steve Nielsen);

- An "honorable person who is a productive and reliable employee" (Letter from Dominic Cortella);

- "a stand-up person who is empathetic and caring" (Letter from Donald G. Brothers);

- "a person of high character and integrity" (Letter from Donald G. Brothers);

- Mr. Galetto has "proven to be of fine and responsible character" (Letter from Roberto Michel);

- "Kevin has always been a responsible and caring partner" (Letter from Norberto Ferrer);

- "Kevin is always looking for ways to help the people around him. He works hard and carries himself in a polite, respectable manner." (Letter from Julio D. Larregui).

None of the people who provided a letter on Mr. Galetto's behalf stated that they felt different about him after his arrest in this case. Notably, several noted that Mr. Galetto expressed regret and remorse over his personal involvement in what transpired on January 6, 2021 (Exh. A" Letter from Milagros Galetto; Letter from Stephen Bott; Letter from Dennis J. Plymale; Letter from James George).

### B.  The events leading up to and on January 6, 2021

Mr. Galetto flew from California to Baltimore, Maryland, on January 5, 2021, to attend the "Stop the Steal" rally organized by then-President Donald J. Trump and his supporters to be held on January 6, 2021. Mr. Galetto had never been to Washington, D.C., before and was excited to visit the nation's capital. Mr. Galetto was not particularly political but had become energized by the Trump presidency. He had also become convinced by people around him and conservative media outlets that the 2020 presidential election had been stolen from President Trump. Mr. Galetto heeded the call to attend the rally and voice his support for President Trump.

Mr. Galetto attended the rally at the White House Ellipse on the morning of January 6th, listening to a number of individuals speak, including then-President Trump. Trump spoke for over an hour, managing to work the growing crowd into a fervor. At the heart of his speech were his false claims that the election had been stolen from him.[2] At the same time, a joint session of the

---

[2] Indeed, Donald Trump has since been indicted for his role in the conspiracy to defraud the United States by, *inter alia*, conspiring to spread false claims of election fraud and using the attack on the Capitol to further his goals. *See*, *United States v. Donald J. Trump*, 23-cr-257-TSC.

United States Congress convened at the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential election that had taken place on November 3, 2020 (Statement of Offense, ECF 56, para. 3).

Trump concluded his speech by imploring his followers to march to the Capitol (with the implication that Trump would join them) to voice their protest and "fight like hell".[3] Prior to that point, Mr. Galetto had no plans to go to the Capitol. Following the former President's call to action, however, Mr. Galetto joined the crowd that marched towards the Capitol building.

At approximately 2:00 p.m., individuals in the crowd forced their way through or over permanent and temporary security barricades around the Capitol (PSR, para. 23; ECF 56, paras. 1, 5). Shortly thereafter, individuals forced entry into the Capitol (PSR, para. 24; ECF 56, para. 6). At approximately 2:20 p.m., members of the House of Representatives and of the Senate, including then-Vice President Mike Pence, evacuated the chambers and halted the certification proceeding (PSR, para. 25; ECF 56, para. 7).

Mr. Galetto worked his way through the crowd unimpeded until he came to the Lower West Terrace tunnel entrance at around 2:40 p.m. (PSR, para. 28; ECF 56, para. 10). Footage from a Metropolitan Police Department body-word cameras and Capitol closed-circuit video cameras (ECF 63, Exh. 1; 2.1) showed Mr. Galetto in the tunnel, near the doorway that permitted access to the Capitol building. The footage shows a group of individuals and the police rush towards each other (ECF 63, Exh. 2 (2:39); 3.1; 4). Mr. Galetto then found himself face-to-face with the front line of police officers and their shields (ECF 63, Exh. 3.2 (0:40); 4 (1:08). As the crowd surged behind Mr. Galetto, he can be seen putting his arms forward and grabbing the top of a shield. A scuffle took place between members of the crowd and the officers, resulting in the Officer B.S.

---

[3] https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial, Transcript of Donald J. Trump's speech on January 6, 2021. [Last accessed, August 4, 2023].

getting knocked to the ground (PSR, para. 30; ECF 56, para. 12; ECF 63, Exh. 2)). Mr. Galetto did not knock Officer B.S. to the ground (Exh. B, pp. 62-63). The video shows that Mr. Galetto's back was turned to the officers at the time of the scuffle (ECF 63, Exh. 3 (2:38-3:10); Exh. 4 (3:30-4:02)). Mr. Galetto was then knocked down to a kneeling position, where he heard Officer B.S. asking for help (Exh. B, p. 29), apparently afraid of being trampled. The body camera footage captured Mr. Galetto kneeling over Officer B.S., attempting to keep his weight off the officer and protecting Officer B.S. from the surging crowd (ECF 63, Exh. 3.2 (3:15-3:36)). In those moments, body-worn camera footage depicts another officer striking Mr. Galetto several times in the head (ECF 63, Exh. 4 (4:22-4:35)). Thereafter, Officer B.S. and Mr. Galetto were lifted off the ground (ECF 63, Exh. 4 (4:40)). Mr. Galetto retreated to the entrance of the tunnel less than four minutes after first being seen in front of the shields (PSR, para. 30; ECF 56, para. 12; ECF 63, Exh. 5).

At that point, Mr. Galetto was physically exhausted, dazed/confused, and psychologically beaten. He retreated from and exited the tunnel, descending down the steps to the terrace floor, to try to take inventory of what had just transpired. At no point in time did he or has he ever harbored the intent to strike or harm police, despite the many ill-intentioned people all around him swinging fists or weapons or throwing things at the police. Mr. Galetto had every opportunity to strike out at police but did not. Even when he was on the ground and being punched in the head, he did not retaliate. As he knelt over Officer B.S., Mr. Galetto did his best to ensure the officer was not trampled or otherwise hurt by others.

As he exited the tunnel, Mr. Galetto heard others implore more people to push into the tunnel. Mr. Galetto repeated the exhortations of those around him, calling for "more people" (PSR, para. 31; ECF 56, para. 13; ECF 63, Exh. 5 (0:33)). Mr. Galetto has never been accused of being an organizer or leader in any capacity, nor is there any evidence to support that.

Mr. Galetto remained outside the Lower West Terrace tunnel with the group congregated there for another hour and a half. At approximately 4:15pm, he briefly attempted to re-enter the tunnel but was repelled before entering (PSR, para. 32; ECF 56, para. 14; ECF 63, Exh. 6). He left the Capitol grounds shortly thereafter. Mr. Galetto never entered the Capitol building beyond the entrance to the Lower West Tunnel, where he contacted the officer's body shield.

### C.  Indictment, Conviction, and Guidelines Range Calculation

Mr. Galetto was charged by Complaint and arrested on April 23, 2021, in Westminster, California (PSR, p. 2; *see* ECF 5, with the felony Obstruction of an Official Proceeding (18 U.S.C. § 1512(c)(2), 2) as the most serious offense charged). He made his initial appearance in the United States District Court for the Central District of California (Santa Ana) on the same day (PSR, p. 2), under Docket No. 8:21-MJ-00288. Mr. Galetto was released on personal recognizance, but with the imposition of location monitoring through a GPS device (ECF 20, p. 20). He made his initial appearance in the United States District Court for the District of Columbia on April 30, 2021 (PSR, p 2), where his conditions of release were continued (ECF 10). In June of 2021, Mr. Galetto sought and received permission from the government to relocate from California to Florida (ECF 13, ECF 15, ECF 17). Indeed, Mr. Galetto was permitted to remove his GPS monitoring device and drive across the country over the course of several days, arriving without an issue. Thereafter, Magistrate Judge Harvey vacated the condition requiring Mr. Galetto to submit to location monitoring (ECF 19, ECF 23). Pretrial Services have confirmed Mr. Galetto has flawlessly complied with his release conditions, despite not having been monitored since leaving California over two years ago (ECF 17, 22, 31, 34, 49, 50, 51, 53, 55).

Thereafter, Mr. Galetto was arraigned on an eight-count indictment (ECF 24)[4] and pled not guilty to all charges on October 26, 2021. The government filed a superseding indictment on October 29, 2021 (ECF 40) adding language to Count 1 regarding the Civil Disorder having impacted commerce and to Count 3 alleging bodily injury to Officer B.S., but the counts against Mr. Galetto otherwise remained the same.

After many conferences and discussions between counsel for Mr. Galetto and the government, a second superseding indictment was filed on May 6, 2022 (ECF 47). The second superseding indictment removed the language from Count 3 charging bodily injury to Officer B.S.,[5] and made some non-substantive changes to the language of Counts 4, 5, 6, 7, and 8.

On March 20, 2023, Mr. Galetto pled guilty to Count 1 (Civil Disorder, 18 U.S.C. § 231(a)(3)) and Count 3 (Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a)(1)) of the second superseding indictment. A conviction under Count 1 carries a maximum sentence of five years imprisonment, a term of supervised release of not more than three years, a fine of $250,000, and an obligation to pay any applicable interest or fines on restitution not timely made. A conviction under Count 3 carries a maximum sentence of eight years imprisonment, a term of supervised release of not more than three years, a fine of $250,000, and an obligation to pay any applicable interest or fines on restitution not timely made. Mr. Galetto has agreed to make restitution in the amount of $2,000. The government agreed to dismiss all remaining counts against Mr. Galetto in exchange for his guilty plea to Counts 1 and 3, including both counts charging acts

---

[4] Count 1: Civil Disorder (18 U.S.C. § 231(a)(3)); Count 2: Obstruction of an Official Proceeding (18 U.S.C. § 1512(c)(2), 2); Count 3: Assaulting Resisting or Impeding Certain Officers (18 U.S.C. §§ 111(a)(1)); Count 4: Entering and Remaining in a Restricted Building or Grounds (18 U.S.C. § 1752(a)(1)); Count 5: Disorderly and Disruptive Conduct in a Restricted Building or Grounds (18 U.S.C. § 1752(a)(2)); Count 6: Engaging in Physical Violence in a Restricted Building or Grounds (18 U.S.C. § 1752(a)(4)); Count 7: Disorderly Conduct in the Capitol Grounds or Buildings (40 U.S.C. § 5104(e)(2)(D)); and Count 8: Act of Physical Violence in the Capitol Building or Grounds (40 U.S.C. § 5104(e)(2)(F)).

[5] Indeed, Officer B.S. was not injured. Mr. Galetto caused no injury on the day.

of violence (Count 6: Engaging in Physical Violence in a Restricted Building or Grounds (18 U.S.C. § 1752(a)(4)) and Count 8: Act of Physical Violence in the Capitol Building or Grounds (40 U.S.C. § 5104(e)(2)(F)).

The PSR reports an advisory guidelines range of 24 to 30 months incarceration and 1-3 years supervised release, resulting from a total offense level 17 and Criminal History Category I (PSR, para. 13; ECF 62). Offense level 17 results in an estimated applicable fine range of $10,000 to $95,000 (PSR, para. 13). The parties agree with this offense level and guideline range (ECF 57, § 7). The Probation Office ultimately recommended a sentence at the bottom of the guidelines range (24 months), 24 months supervised release, and a fine of $5,000 (ECF 62).

Both the plea agreement and the presentence investigation report recognized that Mr. Galetto can seek a variance and request a sentence outside the applicable guidelines range based upon the factors to be considered in imposing a sentence pursuant to 18 U.S.C. § 3553(a) (ECF 57, § 8; PSR, para. 14). In addition, This Honorable Court noted at the plea allocution on March 20, 2023, (Exh. B, p. 50), that Mr. Galetto retained his right to seek resentencing under 18 U.S.C. § 3582 in the event that the United States Sentencing Commission amended the guidelines in a way that would change his guideline range to his benefit (*see also*, ECF 57, Plea Agreement).

### III.    ARGUMENT

#### A.  Legal Standard

Since *United States v. Booker* (543 U.S. 220 [2005]), the Supreme Court has required district courts to consider both the Sentencing Guideline range and the sentencing factors set out in 18 U.S.C. § 3553(a) when determining a criminal defendant's ultimate sentence. As such, sentencing courts are instructed to first correctly calculate the Guideline range for a given defendant, then consider the § 3553(a) factors to determine whether a sentence within the Guideline range is appropriate or whether a departure or variance from the Guidelines is warranted (*Nelson v. United States*, 555 U.S. 350, 352 [2009], "[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable . . . [T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply", *citing Gall v. United States*, 552 U.S. 38, 50 [2007]). As the Supreme Court made clear in *Gall* and *Kimbrough v. United States*, 552 U.S. 85 [2007], the Sentencing Guidelines are simply an advisory tool to be considered alongside other statutory considerations set forth in 18 U.S.C. §3553(a).

An individualized assessment of each sentence requires "that district courts consider the defendant's nonfrivolous arguments for a downward departure, impose an individualized sentence based on the characteristics of the defendant and the facts of the case, and explain the sentence chosen" (*United States v. Overby*, 757 Fed. Appx. 284, 285 [4th Cir 2019]; *citing Gall*, 552 U.S. at 50). A "sentencing judge should set forth enough to satisfy the appellate court that [s]he has considered the parties' arguments and has a reasoned basis for exercising [their] own legal decision-making authority" by articulating how the sentencing factors apply to the case before it (*Rita v. United States*, 551 U.S. 338, 356 [2007]).

Pursuant to § 3553(a), the Court shall "impose a sentence sufficient, but not greater than necessary to comply with" the need for the sentence imposed to meet the general sentencing purposes set forth is subsection 2 of § 3553(a). The factors in § 3553(a) are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant;

    (D) to provide the defendant with needed with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kind of sentences available;

(4) the kinds of sentence and the sentencing range established… [by the Sentencing Guidelines];

(5) any pertinent policy statement… issued by the Sentencing Commission…;

(6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

**B.  The § 3553(a) Factors Favor a Downward Variance**

When viewed together, the § 3553(a) factors warrant a downward variance in Mr. Galetto's sentence: (1) the nature and circumstances of the offense; (2) the personal history and

characteristics of Mr. Galetto as evidenced by the character letters and his life-long record of being a law-abiding citizen; (3) the general purposes of sentencing warrant a lower sentence; and (4) the need to avoid unwarranted sentencing disparities.

### 1. The nature and circumstances of the offense

When Mr. Galetto traveled to Washington D.C. on January 5th, 2021, he did so with the sole intention of attending a Trump rally organized to protest what Mr. Galetto believed to be a stolen presidential election. Mr. Galetto did not go to Washington, D.C. with the intention of committing a crime or engaging in an insurrection. Like many others who were at the Capitol on January 6th, 2021, Mr. Galetto blindly followed the many figures who falsely but persistently claimed that the election had been stolen from the president. Those voices, including the voice of the then-president and Commander-in-Chief Donald Trump and his personal attorney and former United States Attorney for the Southern District of New York Rudolph Giuliani, had convinced otherwise law-abiding and productive citizens such as Mr. Galetto that they must take action to stop the transition of the allegedly stolen presidency. Mr. Galetto is one of millions of citizens who were duped into believing that, due to corruption, the presidential election had been "stolen." Unfortunately, he was also one of the thousands who mistakenly believed that it was his patriotic duty to stand up and do what he could to prevent this perceived miscarriage of justice to protect his country.

In his own mind, Mr. Galetto believed that the President and his supporters were in the right and the law enforcement officers guarding the Capitol were wrong. In hindsight and after thorough reflection, this was foolish and wrong and in no way excuses Mr. Galetto's criminal conduct, which he has owned. However, this is an honest and vulnerable peek into Mr. Galetto's mindset at the time of the crimes in question. To be sure, Mr. Galetto regrets his actions, the harm

he caused, and recognizes that his conduct was criminal and wholly unacceptable in a civilized society.

Mr. Galetto went to Washington, D.C. not as part of any organized group, but as an individual wishing to make his voice heard. He wore two hats (one in support of Trump and the second in support of the fallen first responders on 9/11), a warm jacket, and jeans. He did not have body armor, weapons, pepper spray, or any other "tactical" gear common amongst those seeking to engage in some form of physical confrontation or combat. Mr. Galetto's "pre-planning" involved the purchase of walkie-talkies so that he could communicate with a friend in the event they were separated and a text message to friends that he was going to "fight for [their] freedom". Indeed, this text message is the most offensive language used by Mr. Galetto prior to January 6th or thereafter, a figurative reference to the general assembly and protest he originally intended to participate in, and, it must be noted, a message sent privately to friends.

At the conclusion of the Trump rally at approximately 1:00p.m., where those in attendance were worked into a frenzy by Trump and other speakers, then-President Trump urged the angry mob to march with him to express their anger and frustration with Congress. Mr. Galetto joined the procession from the White House to the Capitol, but the President never joined the march. Mr. Galetto had no way of knowing what would follow.

Mr. Galetto seeks in no way to minimize the conduct to which he has pled guilty. His conduct unquestionably interfered with law enforcement and their ability to perform their mandated functions. For that, he understands that he must face the consequences that This Honorable Court will impose upon him.

It must be recognized, however, the specific conduct of Mr. Galetto underlying both counts to which he pled guilty. The evidence presented to the Court includes video footage of the events

that transpired in the Lower West Terrace tunnel. The clear footage shows that Mr. Galetto was at the front of the group that surged forward when the glass doors were opened by Capitol police units. He does not deny that he grabbed the top of a riot shield held by MPD Officer B.S. At no point, however, does Mr. Galetto come into contact with **the person** of MPD Officer B.S., nor did Mr. Galetto attempt to strike or push the officers or pull the shield—as many, many others did on camera. Indeed, Mr. Galetto had multiple opportunities to commit acts of violence at any grade or level—most specifically when he was forced down to one knee, hunched over the then-prone MPD Officer B.S. Upon hearing Officer B.S. ask for help, rather than contacting MPD Officer B.S. in any way, Mr. Galetto deliberately kept his body weight up and avoided contacting the officer in an obvious effort to protect him. This was despite the fact that, in those moments, another MPD officer twice punched Mr. Galetto in and about the head. It must also be emphasized that MPD Officer B.S. was knocked to the ground during what has been labeled a "scuffle", but Mr. Galetto himself did not knock MPD Officer B.S. to the ground. Indeed, Mr. Galetto himself was also knocked to the ground at the same time. The only contact Mr. Galetto made with Officer B.S. was with the shield he was holding.

Ultimately, the body-worn camera footage supports Mr. Galetto's position that he had no intention of harming anyone. Although the charges to which Mr. Galetto pled guilty are serious, mitigating factors also stand out. Mr. Galetto did not inflict bodily injury on the officers in the tunnel, nor was that his intent.

He was not armed, did not bring weapons, pepper spray or similar, or any protective armor. He is not alleged to be a member of any of the various groups or organizations that planned or sought to provoke violence that day. Mr. Galetto also did not enter the Capitol building at any point on January 6, 2021.

Mr. Galetto recognizes that the harm caused by the collective acts of the January 6th attack on Congress and the country was horrendous. Mr. Galetto should not, however, be punished for the actions of the collective, but only for his own acts.

### 2. Mr. Galetto's personal history and characteristics

The defense set forth above (Section II.A) in detail who Mr. Galetto is through the eyes of the people who know him best. The defense does not repeat here those details, but notes that they demonstrate that Mr. Galetto has lived a law-abiding and generous life until the instant charges against him. The letters provided in support of Mr. Galetto reveal him to be a kind, selfless man dedicated to improving the lives of those around him. Whether from friend or family, fellow church member, or colleague from work, the unanimous descriptions of Mr. Galetto are that he is man of integrity—honest, is hard-working, and respected. At the heart of those descriptions is that Mr. Galetto has, over the past several decades and from coast to coast, devoted his time and energy to serving and assisting those in need through his local church. While in California, the church was his platform to help those in need. Upon arriving in Florida, he immediately found a new church and picked up right where he left off.

### 3. The general purposes of sentencing

As noted above, the sentence imposed must (A) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (B) afford adequate deterrence to criminal conduct; (C) protect the public from further crimes of the defendant; and (D) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. An assessment of these factors most certainly warrants a downward variance in the sentence imposed.

18

Mr. Galetto has already addressed the specific circumstances of the offense. It would be disingenuous to argue that the ugly events that took place at the Capitol on January 6th were not extremely serious and disturbing, and counsel in no way wishes to minimize the criminality of the events of the day. The fact that Mr. Galetto was present and participated in the conduct that he did warrants serious consideration. However, as noted above, while Mr. Galetto's conduct does meet the legal elements of § 231(a)(3) and § 111(a)(1), he was not there as part of an organized group that had planned ahead to storm the Capitol or cause damage, and his contact with Officer B.S. was minimal and limited to the touching of his shield. Crucially, there is zero evidence that Mr. Galetto possessed the intent to injure any police officer and he did not ever even attempt to do so.

Mr. Galetto, currently 63 years old, lived a law-abiding life until the instant offense. He has accepted responsibility for his role in the events on January 6th by pleading guilty to two felonies. He has fully complied with all pretrial release requirements. These facts, combined with the litany of character letters describing Mr. Galetto as a kind, generous man of integrity and responsibility, indicate that Mr. Galetto has an extremely low risk for recidivism and is not the type of person in need of deterrence from repeating such aberrant conduct in the future.[6] There is simply no reason to believe that Mr. Galetto will do anything other than faithfully comply with the law going forward and no reason to fear that he will suffer a similar lapse in judgment again. Mr. Galetto is not a man from whom the public needs protection from further crimes.

With respect to general deterrence, the Government has indicted over a thousand persons in connection with the January 6, 2021, debacle at the Capitol. The charges range from misdemeanors to the most serious felony of insurrection. These prosecutions have received

---

[6] *See also*, the Zero Point Offender amendment, discussed more fully below at III.C, where United States Sentencing Commission cites research that indicates that "zero-point" offenders like Mr. Galetto have considerably lower recidivism rates than other offenders.

widespread media coverage over the past two-plus years. There is no need to subject Mr. Galetto to any additional punishment to send a message to others that any similar conduct in the future will be punished. Sentencing Mr. Galetto to prolonged incarceration will have little impact on ensuring that the events of January 6th will never occur again. Individuals like Mr. Galetto have already been deterred by the threat of prosecution, especially where most of them have not been previously exposed to the criminal justice system and prison sentences in any way. The message has rung out loud and clear that violators will be prosecuted to the fullest extent of the law.

Finally, Mr. Galetto is retired after having been employed for over forty years and having obtained his bachelor's and master's degrees while working full-time. He is not someone in need of educational or vocational training through the prison system.

### 4. The need to avoid unwarranted sentencing disparities

The disparity that would be created by sentencing Mr. Galetto within or near the 24–30-month guideline range is the most compelling reason for a downward departure well below the 24-month bottom of the guideline range.

According to the Justice Department, as of August 2, 2023, over 550 people have been convicted and sentenced for their conduct on January 6, 2021.[7]  A comparison of sentences for similar conduct or charges in other January 6 Capitol cases demonstrate that a sentence in the 24–30-month guideline range would indeed create a significant and unwarranted sentence disparity. Mr. Galetto draws the Court's attention to the arguably more serious offense for which Mr. Galetto pled guilty, 18 U.S.C. § 111(a)(1). Mr. Galetto's conduct, when compared with the conduct of

---

[7] https://www.justice.gov/usao-dc/capitol-breach-cases

defendants underlying the many other sentences already handed down[8] warrants a less severe sentence than those individuals and for a less severe sentence than the guidelines range suggests:

- ***United States v. Ricky Willden***, 21-CR-423-RC. Willden, a member of the Proud Boys, assaulted numerous police officers with a chemical irritant, wore goggles that he had brought with him, and then threw the canister at the officers. He entered the Capitol. He pled guilty to § 111(a)(1). Willden had a criminal history category of I and a guideline range of 24-30 months. He was sentenced to 24 months.

- ***United States v. Joshua Hernandez***, 22-CR-42-CRC. Hernandez climbed through the window at the Senate Wing Door, entered the speaker's conference room and Senate gallery, hit a door in the hallway with his flagpole, and attempted to enter a room where congressional staff were barricaded in an office. He also pushed against a police line. Hernandez also hit a police officer in the head with his flagpole. Hernandez pled guilty to § 111(a)(1) and § 231(a)(3). Hernandez had a criminal history category of I and a guideline range of 24-30 months. He was sentenced to 24 months.

- ***United States v. Michael Dickinson***, 21-CR-649-JDB. Dickinson was at the north side of the Capitol, where he approached the police line and threw a "coffee tumbler" at the officers, hitting one in the face and chest, and then hit another officer. He subsequently poured a bucket of liquid on a group of officers. Dickinson pled guilty to one count of § 111(a)(1), although he was also charged with a second count of § 111(a)(1), as well as § 231(a)(3). Dickinson had a criminal history

---

[8] All facts and sentences are taken from the parties' Statements of Offense, Plea Agreements, and Sentencing Memoranda in their respective cases, and the Government's sentencing chart available at https://www.justice.gov/usao-dc/capitol-breach-cases.

category of I and a guideline range of 24-30 months. He was sentenced to 20 months.

- *United States v. Michael Eckerman*, 21-CR-623-CRC. Eckerman observed several confrontations along police lines and yelled at officers before entering the Capitol through the Upper West Terrace doors. He was part of a group to push through officers near the Speaker's Lobby. An officer put his hand on Eckerman's shoulder, which Eckerman forcefully removed, causing the officer to stumble down steps and fall to the ground. Eckerman pled guilty to § 111(a)(1). Eckerman had a criminal history category of I and a guideline range of 24-30 months. He was sentenced to 20 months.

- *United States v. Barton Shively*, 21-CR-151-JMC. Shively pushed and punched two officers. He pled guilty to two counts of § 111(a)(1). Despite a guideline range of 30-37 months (criminal history category I), he was sentenced to 18 months.

- *United States v. Brian Gundersen*, 21-CR-137-RC. Gundersen entered the Capitol near the Parliamentarian Door. Despite witnessing protesters fighting with police, he held the door open for more people to enter. Gundersen went to the Parliamentarian's Office, where he observed people ransacking the office. Gundersen wrote a note on the papers before exiting the office. He briefly exited and re-entered the Capitol. After being expelled by police, he confronted a police line outside the building. He rushed at one officer, hitting the officer with his arm. Gundersen was found guilty of 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 111(a)(1) after a stipulated bench trial. The government recommended a sentence of 46 months, but he was sentenced to 18 months.

- ***United States v. Troy Sargent***, 21-CR-258-TFH. Sargent swung an open hand at officers, hitting one, then swinging again (at the officer) and hitting another protester. He bragged afterwards that he got two shots on one officer. He pled guilty to § 111(a)(1) and § 231(a)(3), as well as several misdemeanors. Sargent had a criminal history category of I and a guideline range of 24-30 months. He was sentenced to 14 months.

- ***United States v. Ronnie Presley***, 21-CR-257-RDM. Presley entered the Capitol through the Upper West Terrace doorway at 2:35pm. He disregarded commands by law enforcement to exit the Rotunda, eventually physically confronting an officer by contacting the officer's baton. Subsequently, when an officer tried to clear the area by pushing Presley and others with a riot shield, Presley grabbed and pulled on the shield. Presley was charged with § 1512(c)(2) but pled guilty to § 231(a)(3). Presley had a criminal history category of IV (*cf.* Mr. Galetto's criminal history category of I) and a guideline range of 18-24 months. He was sentenced to 12 months.

- ***United States v. Bruno Cua***, 21-CR-107-RDM. Cua climbed the scaffolding to get to the Upper West Terrace while carrying a baton. He entered Capitol through the Upper West Terrace doors at 2:36 p.m. Facing a police line inside, he held up the baton, but after the officers backed off, Cua entered the Capitol. Cua was in Rotunda for a few minutes, witnessing protesters fighting with officers. He proceeded to the Senate chamber doors, where an officer was attempting to lock doors to the chamber. When another protester intervened with the officer, Cua moved forward and interacted with the officer, causing physical contact. Cua then

entered Senate Gallery, eventually jumping from the Senate Gallery to the Senate Floor, where he sat in the Vice-President's chair. After a stipulated bench trial, Cua was found guilty of 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 111(a)(1). The government recommended a sentence of 57 months, but he was sentenced to 12 months.

- *United States v. Philip Young*, 21-CR-617-DLF. Young and other protesters were at the police line at the Upper West Terrace by 2:46, where the group attempted to push through the barriers. Young rushed up the stairs, grabbed and lifted a barricade and pushed it into two MPD officers; after being forced back down the stairs, he pushed the barricade forward against the officers a second time. After getting pepper sprayed, he retreated and left the Capitol grounds, but not before deflating the tires of a police vehicle as he left the grounds. Young pled guilty to the indictment, including § 111(a)(1) and § 231(a)(3). The government requested a sentence of 40 months, but he was sentenced to eight months.

- *United States v. Grayson Sherrill*, 21-CR-282-TSC. On his way towards the Capitol building, Sherrill picked up a metal pole from a broken barricade, which he then swung at an officer. He entered Capitol while still carrying the pole. He pled guilty to § 111(a)(1) and (b), with a guideline range of 37-46 months (criminal history category I). He was sentenced to seven months.

- *United States v. Mark Leffingwell*, 21-CR-5-ABJ. Leffingwell, a veteran who entered the Capitol at the Senate wing doors and chanted at officers standing before him to "join us" and then, when two officers tried to repel him and the crowd around him, struck both officers in the head, landing three blows. He pled guilty to §

111(a)(1). Leffingwell had a criminal history category of I and a guideline range of 24-30 months. The government sought 27 months, but he was sentenced to six months.

- ***United States v. David Blair***, 21-CR-186-PLF. Blair, who carried a large confederate flag and a backpack containing a knife and duct tape, pushed a large lacrosse stick against a police officer's chest while yelling that he would not submit to commands. He pled guilty to § 231(a)(3), although he was also charged with § 111(a)(1) and § 1512(c)(2). Blair had a criminal history category of I and a guideline range of 8-14 months. He was sentenced to five months.

When compared to individuals sentenced to periods of incarceration in the 24-30 months range recommended here, it is clear that a downward variance is warranted based on the relative conduct in question and harm caused. At a minimum it is worth comparing the intentions for those received sentences of 24 months. Willden (24 months) assaulted numerous officers with chemical irritant and threw the bottle at officers. Hernandez (24 months) entered the Capitol and hit an officer in the head with a flagpole. These actors clearly intended violent actions against the police officers at the Capitol. Mr. Galetto's far less egregious conduct warrants a far lesser sentence than those given above.

Turning to several of the cases detailed above, where the defendants received sentences significantly lower than the guidelines ranges they faced. To be sure, the guidelines cannot and do not consider the universe of available data involving the 500-plus sentences handed down for the January 6th Capitol convictions. Brian Gundersen, after entering and exiting the Capitol building, confronted a police line, rushed at officers, and deliberately struck one with his arm; he was

sentenced to 18 months. Bruno Cua (12 months) threatened officers with a baton, entered the Capitol building, intentionally caused physical contact with the person of an officer, and jumped from the Senate Gallery to the Senate Floor, where he sat in the Vice-President's chair. Philip Young pushed a barricade into officers on two occasions; he was sentenced to eight months. Grayson Sherrill swung a metal pole at an officer and then entered the Capitol while still carrying the pole; he was sentenced to seven months. Leffingwell (sentenced to six months) deliberately swung at two officers, landing three blows. David Blair was sentenced to five months despite his having been armed with a knife and deliberately making contact with an officer with a lacrosse stick. Once again, each of these defendants clearly intended to make violent contact with police officers, regardless of whether injuries were suffered. Mr. Galetto's conduct here, and specifically the lack intent to act violently, warrants a significant downward variance to avoid disparities in sentencing. The lack of intent to act violently appears to be conceded by the government in having dismissed the two (2) counts charging violence (Counts 6 and 8).

To be sure, sentencing Mr. Galetto to a greater term of incarceration than Cua (12 months), Young (8 months), Sherrill (7 months), Leffingwell (6 months), and Blair (5 months) would create a significant and unwarranted disparity.

### C. Zero-Point Offender Amendment

A final consideration warranting a downward variance in the sentence is the pending amendments to the Federal Sentencing Guidelines, which shall take effect on November 1, 2023, a mere three (3) months after Mr. Galetto is to be sentenced.[9] The new Sentencing Guidelines

---

[9] The full text of the amendments is available here: https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230405_prelim-RF.pdf.

include an two (2) level downward adjustment of the defendant's offense level where the defendant did not receive any criminal history points and meets the ten (10) criteria.[10]

The rationale for the reduction is that "[r]ecidivism data analyzed by the Commission suggest that offenders with zero criminal history points ('zero-point' offenders) have considerably lower recidivism rates than other offenders, including lower recidivism rates than the offenders in Criminal History Category I with one criminal history point" (pp. 71-72, *citing* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 [2021], available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010).

Indeed, the government has already started recommending sentences that take into account the 2-level reduction in anticipation of the passage of the amendments.[11] The rationale for the proposed amendment applies directly to Mr. Galetto. As confirmed by the presentence investigation report, he has zero criminal history points and, based on his situation and circumstances, is an individual with an extremely low risk for recidivism.

The Plea Agreement (ECF 57) permits Mr. Galetto to file a motion under 18 U.S.C. § 3582(c)(2) to ask a Court to review a sentence of imprisonment where the sentencing range

---

[10] The full list of criteria are: (1) the defendant did not receive any criminal history points from Chapter Four, Part A; (2) the defendant did not receive an adjustment under §3A1.4 (Terrorism); (3) the defendant did not use violence or credible threats of violence in connection with the offense; (4) the offense did not result in death or serious bodily injury; (5) the instant offense of conviction is not a sex offense; (6) the defendant did not personally cause substantial financial hardship; (7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense; (8) the instant offense of conviction is not covered by §2H1.1 (Offenses Involving Individual Rights); (9) the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense); and (10) the defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848;

[11] *See*, *eg*., *United States v. Trunz*, Eastern District of New York, 19-CR-375 (WFK), Dkt. 25, p. 5, where the government's sentencing memorandum notes that Court may wish to consider a downward variance based on the proposed amendment; *United States v. Bernard Curran*, Northern District of California, 21-CR-453, Dkt. 70, p. 7, where the government proposed a below-Guidelines recommendation based on the defendant's criminal history and the fact that he would receive a two-level downward adjustment if sentenced after November 1, 2023; *United States v. Jonathan Yet Wing Soong*, Northern District of California, 22-CR-453, Dkt. 41, pp. 1-2, where the government did not oppose the defendant's request for a two-level variance based on the proposed amendments to the sentencing guidelines.

imposed would be lowered based on amendments to the Sentencing Guidelines. Thus, once the proposed amendments go into effect, Mr. Galetto would be entitled to apply for resentencing to account for the new amendments.

Applying the two-level reduction in the instant case would give Mr. Galetto an offense level of 15, and a guideline range of 18-24 months.

### D.  No fine should be imposed

The defense requests this Honorable Court not impose a fine in this case. In the overwhelming majority of January 6 cases, no fines have been imposed.[12] Where fines have been imposed, they occurred in cases where probation or home detention was an option and the time was reduced in lieu of the financial penalty, or where the defendant destroyed or stole property. Those circumstances do not exist in the instant case.[13]

Per the terms of the plea agreement, Mr. Galetto has agreed to pay restitution in the amount of $2,000.

### E.  No supervised release is necessary

The defense noted previously that Mr. Galetto is not the type of individual at risk of recividism. He understands the gravity of his mistake and will not make the same mistake—or similar—again. The purposes of supervised release, to ensure that an individual remains on the straightened arrow following release from prison, are not applicable here. To the contrary, they

---

[12] https://www.justice.gov/usao-dc/capitol-breach-cases
[13] The Probation Office recommended a fine of $5,000, below the guideline range of $10,000-$95,000 (ECF 62).

would be an unnecessary expenditure of government resources. Consequently, Mr. Galetto respectfully suggests This Honorable Court not impose any supervised release in this case.[14]

### F.  Mr. Galetto requests the Court permit him to self-surrender

Mr. Galetto requests that he be permitted to self-surrender and that This Honorable Court recommend he be housed at the Federal Correctional Institution Coleman in Sumterville, Florida. Mr. Galetto has faithfully complied with all pretrial conditions, treated this Court his respect, and poses no risk of flight. FCI Coleman is the closed federal facility to his place of residence and would allow his wife to visit on a regular basis. Indeed, as stated above, Mr. Galetto was permitted to travel across the country in a recreational vehicle, without monitoring.

---

[14] The Probation Office recommended a period of 24 months supervised release to "allow the probation office to monitor Galetto's reintegration into society" (ECF 62, p. 2).

## IV.     CONCLUSION

The guideline range of imprisonment is greater than necessary in these facts and circumstances. A particularized and in-depth analysis of the § 3553(a) factors, along with the sentencing guidelines issues identified above, weigh in favor of a sentence well below the guideline range.

For the foregoing reasons, Mr. Galetto respectfully requests a sentence be imposed of no more than six (6) months or less of incarceration, without the imposition of a fine or supervised release.

By: /s/ *Richard A. Portale*_____
RICHARD A. PORTALE
*Attorneys for Defendant*
245 Main Street, Suite 605
White Plains, New York 10601
Tel:     (914) 359-2400
E-mail: rportale@portalerandazzo.com
D.C. Bar No. NY0435

By: /s/ *Chad Mair*_____
CHAD MAIR
*Attorneys for Defendant*
245 Main Street, Suite 605
White Plains, New York 10601
Tel:     (914) 359-2400
E-mail: cmair@portalerandazzo.com
New York Bar No. 5703012

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I filed the foregoing Sentencing Memorandum of Behalf of Kevin Galetto via the Court's Electronic Filing (ECF) system, which sent notification to Sean McCauley, Assistant United States Attorney, 601 D. Street, NW, Washington, DC 20530, via his email address (Sean.McCauley@usdoj.gov) on August 4, 2023.


By: <u>/s/ *Chad Mair*____</u>
CHAD MAIR
*Attorneys for Defendant*
245 Main Street, Suite 605
White Plains, New York 10601
Tel:     (914) 359-2400
E-mail: cmair@portalerandazzo.com
New York Bar No. 5703012