# EXHIBIT B

```
                  UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA

 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
UNITED STATES OF AMERICA,        )  Criminal Action
                                 )  No. 21-517
vs.                              )
                                 )
KEVIN LOUIS GALETTO,             )  March 20, 2023
                                 )  2:36 p.m.
              Defendant.         )  Washington, D.C.
                                 )
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF PLEA COLLOQUY**
**BEFORE THE HONORABLE COLLEN KOLLAR-KOTELLY**
**UNITED STATES DISTRICT COURT SENIOR JUDGE**


**<u>APPEARANCES</u>:**


FOR THE UNITED STATES:
                    KAITLIN KLAMANN
                    USAO
                    601 D Street NW
                    Washington, DC 20530
                    (202) 252-6778
                    Email: kaitlin.klamann@usdoj.gov


FOR THE DEFENDANT:
                    RICHARD A. PORTALE
                    CHAD MAIR
                    Portale and Randazzo, LLP
                    245 Main Street, Suite 605
                    White Plains, NY 10601
                    (914) 359-2400
                    Email: rportale@portalerandazzo.com



Court Reporter:     Elizabeth Saint-Loth, RPR, FCRR
                    Official Court Reporter


             Proceedings reported by machine shorthand.
        Transcript produced by computer-aided transcription.
```

1                    **P R O C E E D I N G S**

2              THE COURTROOM DEPUTY:  Criminal Case 21-517, the

3       United States versus Kevin Louis Galetto.

4              Counsel, would you please identify yourselves for

5       the record, starting with the government.

6              MS. KLAMANN:  Good afternoon, Your Honor.

7       Kaitlin Klamann for the United States standing in for my

8       colleague, AUSA Sean McCauley, who had a scheduling conflict

9       this afternoon.

10             THE COURT:  Okay.

11             MR. PORTALE:  Good afternoon, Judge.

12      Richard Portale of Portale Randazzo.  To my right is

13      Mr. Chad Mair, and to my left is Mr. Galetto.

14             THE COURT:  All right.  Good afternoon.

15             So we're here for a plea.  I am going to leave

16      you, Mr. Galetto, sitting where you are instead of standing

17      because we need to have you speak into the microphone; I

18      think it will be easier than having you to get up.

19             MR. PORTALE:  Judge, if I may, we're going to

20      share the microphone.  We may have to pass it back and forth

21      a bit.

22             THE COURT:  That's fine.  Most of it is going to

23      be really what he has to say anyway, in terms of the

24      inquiry.

25             MR. PORTALE:  Okay, Judge.

1        THE COURT:  But Mr. Galetto is compliant with his

2   pretrial conditions.  The last version I received did

3   correct in the letter which counts he's pleading guilty to.

4   And the statement of offense evidently didn't have any

5   changes to it, ultimately.

6        MR. PORTALE:  Right.

7        THE COURT:  So let me have Ms. Patterson swear

8   Mr. Galetto in.

9        (KEVIN LOUIS GALETTO, Defendant, was sworn.)

10        THE DEFENDANT:  I do.

11        THE COURT:  All right.  So let me -- I want to

12   make sure you understand that you are now under oath.  If

13   you don't answer my questions truthfully, you can be

14   prosecuted for perjury or for making a false statement.

15        Do you understand that?

16        THE WITNESS:  Yes, Your Honor.

17        THE COURT:  All right.  In terms of the process, I

18   am going to be asking you some questions.  And it will be --

19   I will set out what you have been charged with in the second

20   superseding indictment, what you are actually pleading to.

21   I will go over some background information relating to you.

22   I will go through your constitutional rights that you are

23   giving up by pleading guilty.

24        The government will state the evidence that they

25   would have presented by proffer if the case had gone to

1    trial, and they need to have facts that meet the elements of

2    the two counts you are pleading guilty to in order for me to

3    accept it.  I will ask you if you agree with it, and I will

4    go through it.  Again, you'll need to admit conduct that

5    meets the elements of the two counts that you are pleading

6    guilty to.

7         We'll then go through the plea letter.  I am not

8    going to go through everything in the plea letter; it

9    doesn't mean it's all not important.  I will go through what

10   I am required to under the rules as well as areas where,

11   sometimes, there might be some misunderstandings or it's a

12   little more complicated, to make sure that there are no

13   misunderstandings about exactly what you are pleading guilty

14   to and what the consequences are in terms of, particularly,

15   sentencing; then I will ask some questions about the

16   voluntariness of the plea.  In the end, I need to make a

17   finding that you are entering it knowingly and voluntarily.

18        If I ask you questions and you don't understand

19   it, please stop me and ask.  Don't just give me answers you

20   think I want to hear.

21        If I have explained things differently than your

22   lawyer did and you have a concern about it, speak up.  I am

23   going to -- obviously, on some of this -- do it in a summary

24   form.  You can consult with your lawyer at any time if you

25   wish to do so; that's not a problem at all.

1          I want to make sure that we have a meeting of the

2    minds of exactly what you are pleading to and what the

3    agreement actually means.

4          Do you understand?

5          THE WITNESS:  Yes, ma'am.

6          THE COURT:  All right.  So in terms of the second

7    superseding indictment, it has eight counts.

8          Count 1 is civil disorder.

9          Count 2 is obstruction of an official proceeding.

10         Count 3 is assaulting, resisting, or impeding

11   certain officers.

12         Count 4 is entering and remaining in a restricted

13   building or grounds.

14         Count 5 is disorderly and disruptive conduct in a

15   restricted building or grounds.

16         Count 6 is engaging in physical violence in a

17   restricted building or grounds.

18         Count 7 is disorderly conduct in the Capitol

19   grounds or buildings.

20         And Count 8 is act of physical violence in the

21   Capitol Building or grounds.

22         You are going to plead guilty to Count 1, which is

23   the civil disorder, and Count 3 which is assaulting,

24   resisting, or impeding certain officers.  You also have

25   agreed to pay $2,000 in restitution.

1              At sentencing, the other counts -- the other six

2      counts will be dismissed.

3              Is that your understanding of the basic agreement?

4              THE WITNESS:  Yes, Your Honor.

5              THE COURT:  You need to speak up so we make sure

6      the court reporter can get a record.

7              THE WITNESS:  Is this better?

8              THE COURT:  Yes.  Perfect.

9              The government has also agreed that you can remain

10     in the community with the present conditions as long as you

11     are in compliance.  They have also reserved allocution,

12     which means they have reserved the right to make

13     recommendations at the time of sentencing, as has your

14     counsel as well.  And the Court will hear from you, if you

15     wish to address me, in making a decision.  But the plea

16     letter does address some issues for sentencing.

17             So let me go into the background questions.

18             How old are you, sir?

19             THE WITNESS:  I am 63 years old.

20             THE COURT:  And what is your date of birth?

21             THE WITNESS:  ██████████████

22             THE COURT:  How far have you gone in school?

23             What is your highest level of education?

24             THE WITNESS:  I have a master's degree in business

25     management.

```
 1              THE COURT:  Where were you born?
 2              THE WITNESS:  I was born in Montrose,
 3    Pennsylvania.
 4              THE COURT:  All right.  Have you taken any alcohol
 5    or drugs or any kind of medication in the last 48 hours?
 6              THE WITNESS:  No, ma'am.
 7              THE COURT:  How did you go through the materials?
 8    Did you read it yourself?  Did your lawyer read it to you?
 9    What was the process?
10              THE WITNESS:  A little combination of both.  They
11    provided me, ahead of time, the information.  And then we
12    discussed it last night while I was here, and again this
13    morning -- or this afternoon, rather.
14              THE COURT:  All right.  Have you ever received any
15    treatment for any type of mental illness or emotional
16    disturbance?
17              THE WITNESS:  No, Your Honor.
18              THE COURT:  Have you received a copy -- did you
19    have a copy of the indictment, particularly the last one,
20    that sets out the pending charges against you?
21              THE WITNESS:  Yes, Your Honor.
22              THE COURT:  Have you had a chance to look it over
23    and discuss it with your lawyer?
24              THE WITNESS:  Yes, Your Honor.
25              THE COURT:  Are you completely satisfied with the
```

1    services of your lawyer in this case?

2              THE WITNESS:  Yes, Your Honor.

3              THE COURT:  Have you had enough time to talk with

4    your lawyer and discuss the case and this plea offer and

5    whether or not you should accept it or go to trial?

6              THE WITNESS:  Yes, Your Honor.

7              THE COURT:  All right.  In terms of your basic

8    constitutional rights, I am going to ask if you understand

9    your rights, and at the end, I will ask if you are willing

10   to give them up.

11             The first is:  You have a right to plead not

12   guilty and have a jury trial.  That means that citizens from

13   the District of Columbia would be summoned to the courtroom;

14   they would be asked questions by the Court and counsel to

15   determine whether they would be fair and impartial to both

16   sides.  They would listen to them -- there would be 12 of

17   them.  They would listen to the evidence; they would apply

18   the jury instructions.  And they would determine your guilt

19   or innocence based on the evidence presented in the

20   courtroom.

21             Do you understand your right to a jury trial?

22             THE WITNESS:  Yes, Your Honor.

23             THE COURT:  Do you understand if you went forward

24   to trial you would have a right to be represented by a

25   lawyer at that trial, and if you could not afford one, one

1    could be appointed?

2              THE WITNESS:  Yes, Your Honor.

3              THE COURT:  Do you understand that at a trial you

4    would have the right, through your lawyer, to confront and

5    cross-examine any witnesses against you?

6              THE WITNESS:  Yes, Your Honor.

7              THE COURT:  Do you understand that you would have

8    the right to present your own witnesses?  And you would have

9    a right to subpoena them; in other words, to require them to

10   come and testify in your defense?

11             THE WITNESS:  Yes, Your Honor.

12             THE COURT:  Do you understand that if there were a

13   trial, you would have the right to testify, present evidence

14   on your own behalf if you wanted to, but that you would not

15   have to testify or present any evidence if you didn't want

16   to because you can't be forced to incriminate yourself?

17   That is, to present evidence of your own guilt.

18             In terms of the jury, I would instruct them that

19   they should not hold that against you, nor infer any kind of

20   guilt based on the fact that you have asserted your

21   constitutional right.

22             Do you understand that?

23             THE WITNESS:  Yes, Your Honor.

24             THE COURT:  Do you understand that unless and

25   until I accept your guilty plea, you are presumed by the law

1    to be innocent because it's the government's burden to prove

2    your guilt beyond a reasonable doubt?  Until it does, you

3    can't be convicted at trial.

4              Do you understand that?

5              THE WITNESS:  Yes, Your Honor.

6              THE COURT:  Do you understand if you went to trial

7    and were convicted, you would have a right to appeal your

8    conviction to a Court of Appeals?  That's a higher court,

9    three judges.

10             Again, you could have a lawyer help you prepare

11   your appeal if you could not afford one.

12             Do you understand that?

13             THE WITNESS:  Yes, Your Honor.

14             THE COURT:  Now, let me discuss -- by pleading

15   guilty you give up your rights.  In terms of appeal, there

16   is a particular provision in your plea letter.  So I would

17   ask if you could open it up to page 8, Capital D.

18             Do you have it in front of you?

19             THE WITNESS:  Yes, ma'am.

20             THE COURT:  Let me go through it because it's a

21   little complicated.

22             You are agreeing to waive -- which means, of

23   course, give up -- insofar as such waiver is permitted by

24   law -- I will get back to that -- the right to appeal the

25   conviction in this case on any basis, including but not

1    limited to:  One, claims that the statute under which you

2    are pleading guilty is unconstitutional; and, two, that the

3    admitted conduct doesn't fall within the scope of the

4    statute; in other words, not criminal.

5           Now, at the present time the statute is

6    constitutional; nobody has said otherwise.  And at the

7    present time your conduct would fall within the scope of the

8    statute.  So you are giving up your right to appeal.

9           Insofar as such waiver is permitted by law means:

10   If, at some later date, some other person takes it up on

11   appeal and the Court of Appeals decides that the statute at

12   issue in your case is unconstitutional or your conduct was

13   not criminal, then you can take a collateral appeal to

14   benefit from that Court of Appeals' decision.

15          Do you understand?

16          THE WITNESS:  Yes, ma'am.

17          THE COURT:  All right.  Further down -- that was

18   the conviction.

19          You also are agreeing to waive -- again, give

20   up -- the right to appeal the sentence, which includes but

21   isn't limited to a term of imprisonment, any fine,

22   forfeiture, award of restitution, term or condition of

23   supervised release, authority of the Court to set conditions

24   of release, and the manner in which the sentence was

25   determined.  So you are giving up that, except if I sentence

1    you above the statutory maximum -- that would be an unlawful

2    sentence -- or above the guideline range, which could be a

3    lawful sentence; but you are reserving the right to be able

4    to take it up on appeal should I do so.

5              And then the last part is:  Notwithstanding that

6    agreement to waive the right to appeal the conviction as

7    sentenced as I have explained it to you, you do retain the

8    right to appeal on the basis of ineffective assistance of

9    counsel but not on other issues.

10             Do you understand and agree?

11             THE WITNESS:  Yes, Your Honor.

12             THE COURT:  All right.  Then let me get back to --

13   so with a few exceptions, any notice of appeal needs to be

14   filed within 14 days of judgment being entered.

15             Again, if you are unable to pay the cost of an

16   appeal, you can ask to have it filed without cost to you.

17   You can also ask to have counsel again appointed to help you

18   with your appeal without cost to you as well.

19             Do you understand?

20             THE WITNESS:  Yes, Your Honor.

21             THE COURT:  Do you want to plead guilty, give up

22   your rights to trial, your right to an appeal, and all of

23   the other rights that I have explained to you?

24             THE WITNESS:  Yes, Your Honor.

25             THE COURT:  All right.  At this point we're going

1    to have the government state the offense.  I would just read

2    the written proffer; I think it puts it in context and gives

3    the rest of the information.

4           I will ask, at the end, if there are any defenses

5    that needs to be specifically waived from counsel.

6           The government -- I would ask that you take the

7    facts in the proffer as to his conduct associated with the

8    elements of the offense.  All right.

9           MS. KLAMANN:  Your Honor, if this case were to

10   proceed to trial, the government --

11          THE COURT:  You need to speak up a little bit.

12   Can you move the microphone more directly --

13          MS. KLAMANN:  Sure, Your Honor.

14          THE COURT:  There you go.

15          MS. KLAMANN:  If this case were to proceed to

16   trial, the government's evidence would show that the

17   United States Capitol, which is located at First Street

18   Southeast, in Washington, D.C., is secured 24 hours a day by

19   United States Capitol Police.

20          Restrictions around the Capitol include:

21   Permanent and temporary security barriers and posts manned

22   by the United States Capitol Police.  Only authorized people

23   with appropriate identification are allowed access inside

24   the Capitol.

25          On January 6, 2021, the exterior plaza of the

1    Capitol was closed to members of the public.  On January 6,

2    2021, a Joint Session of the United States Congress convened

3    at the Capitol, which is located at First Street Southeast,

4    in Washington, D.C.

5            During the Joint Session, elected members of the

6    United States House of Representatives and the United States

7    Senate were meeting to certify the vote count of the

8    Electoral College of the 2020 presidential election, which

9    had taken place on Tuesday, November 3rd, 2020.

10           The Joint Session began at approximately 1 o'clock

11   p.m.  Shortly thereafter, by approximately 1:30 p.m., the

12   House and Senate adjourned to separate chambers to resolve a

13   particular objection.

14           Vice President Mike Pence was present and

15   presiding, first in the Joint Session and then in the Senate

16   chamber.

17           As the proceedings continued in both the House and

18   the Senate, and with Vice President Pence present and

19   presiding over the Senate, a large crowd gathered outside

20   the Capitol.  Temporary and permanent barricades, as noted

21   above, were in place around the exterior of the Capitol, and

22   United States Capitol Police officers were present and

23   attempting to keep the crowd away from the Capitol and the

24   proceedings underway inside.

25           At approximately 2 o'clock p.m., certain

1    individuals in the crowd forced their way through, up, and

2    above the barricades.

3           Officers of the United States Capitol Police were

4    forced to retreat, and the crowd had advanced to the

5    exterior facade of the building.  The crowd was not lawfully

6    authorized to enter or remain in the building.  And prior to

7    entering the building, no members of the crowd submitted to

8    security screenings or weapons checks as required by the

9    United States Capitol Police officers or other authorized

10   security officials.  At such time, the certification

11   proceedings were still underway, and the exterior doors and

12   windows of the Capitol were locked or otherwise secured.

13          Members of the United States Capitol Police

14   attempted to maintain order and keep the crowd from entering

15   the Capitol.  However, shortly after 2 o'clock p.m.,

16   individuals in the crowd forced entry into the Capitol,

17   including by breaking windows and by assaulting members of

18   law enforcement.

19          As others in the crowd encouraged and assisted

20   those acts, the riot resulted in substantial damage to the

21   Capitol requiring the expenditure of more than $1.4 million

22   of repairs.

23          Shortly thereafter, at approximately 2:20 p.m.,

24   members of the House of Representatives and of the Senate,

25   including the President of the Senate, Vice President Pence,

1    were instructed to and did evacuate the chambers.

2    Accordingly, all proceedings of the United States Congress,

3    including the Joint Session, were effectively suspended

4    until shortly after 8 o'clock p.m. on January 6, 2021.

5          In light of the dangerous circumstances caused by

6    the unlawful entry of the Capitol, including the danger

7    posed by individuals who had entered the Capitol without any

8    security screening or weapons check, congressional

9    proceedings could not resume until after every unauthorized

10   occupant had been removed from or left the Capitol and the

11   United States Capitol Police confirmed that the building was

12   secured.

13         The proceedings resumed at approximately 8 o'clock

14   p.m. after the building had been secured.

15         Vice President Pence remained in the Capitol from

16   the time he was evacuated from the Senate chamber until the

17   session resumed.

18         The defendant, Kevin Galetto, traveled by plane on

19   January 5th, 2021, from his then home in Westminster,

20   California, to Washington, D.C., to attend the "Stop the

21   Steal" rally on January 6, 2021.

22         In December 2020, Galetto told a group of friends

23   via text that he was going to Washington to "Fight for their

24   freedom."

25         Around 2:40 p.m. on January 6th, the defendant

1   approached the lower West Terrace tunnel entrance.  He was

2   wearing a black Trump baseball hat, a black headband, an ear

3   warmer, a tan jacket, and a gray hoodie as he entered the

4   tunnel.  He was one of the first individuals inside the

5   tunnel, and was met with a large police presence denying him

6   and the larger crowd entrance into the Capitol Building.

7          The crowd in the lower West Terrace tunnel was

8   significant, and numbered well more than three individuals.

9   This assemblage, of which defendant was a part, confronted

10  the police officers in the lower West Terrace who were

11  attempting to hold the crowd from entering the Capitol

12  through the tunnel.  Some members of this assemblage engaged

13  in acts of violence.

14         Evidence from body-worn camera of a Metropolitan

15  Police Department officer, B.S., captured the defendant at

16  the entryway doors of the lower West Terrace tunnel.  At

17  approximately 2:43 and 26 seconds that afternoon, body-worn

18  camera captured the defendant with his arms extended and

19  pressed up against MPD officer shields.

20         At approximately 2:44 and 14 seconds that

21  afternoon, body-worn camera captured the defendant's body

22  pressed up against officer shields.

23         At approximately 2:46 and 20 seconds that

24  afternoon, the body-worn camera captured a scuffle involving

25  the defendant.  Officer B.S. was knocked to the ground.

1    At approximately 2:46 and 28 seconds that

2 afternoon, body-worn camera captured the defendant on one

3 knee with a hand on the ground.

4    At approximately 2:47 and 2 seconds that

5 afternoon, the defendant rose to his feet and retreated from

6 the area of the tunnel.

7    As he made his way from the inside to the tunnel

8 entrance, the defendant shouted to the crowd outside, "More

9 people," in an attempt to summon more rioters to the tunnel

10 entrance.

11    Defendant remained at the tunnel for over an hour

12 and a half and was part of the -- one of the last pushes

13 against police officers, at approximately 4:15 p.m.

14    Defendant's extended presence in the tunnel and

15 his violent confrontation with officers as part of the crowd

16 presented an immediate risk of injury to person or damage to

17 property.

18    On the evening of January 6, 2021, the defendant

19 texted an individual on his cell phone noting that the

20 politicians, "need to be overthrown," and that Mike Pence

21 "is a trader [sic]."

22    Your Honor, with respect to the elements of the

23 two charges against the defendant, Count 1 charges a

24 violation of Title 18, United States Code,

25 Section 231(a)(3).  The first element of that charge is that

1    the defendant knowingly committed an act or attempted to

2    commit an act with the intended purpose of obstructing,

3    impeding, or interfering with a law enforcement officer.

4              Paragraphs 12, 13, and 14 in the statement of

5    offense establish that element; namely, defendant's

6    interaction with Officer B.S. in the tunnel; defendant's

7    encouragement of other rioters to enter the tunnel and

8    further impede police; and defendant's participation in a

9    push against officers later that afternoon.

10             The second element of the violation of

11   Section 231(a)(3) is that law enforcement was engaged in the

12   lawful performance of his official duties incident to and

13   during a civil disorder.  Paragraph 12 of the statement of

14   offense establishes that element.  It speaks to a specific

15   member of the Metropolitan Police Department, Officer B.S.,

16   with whom the defendant had physical contact; and at the

17   time that that contact occurred, Officer B.S. was a member

18   of the Metropolitan Police Department.

19             The third element for a violation of Section 231

20   is that the civil disorder obstructed, delayed, or adversely

21   affected either commerce or the movement of any article or

22   commodity in commerce, or the conduct or performance of any

23   federally protected function.

24             Paragraphs 3 and 7 of the statement of offense

25   discuss the interruption of the certification of the

1   electoral vote.  And that electoral vote -- the

2   certification of the Electoral College vote was a federally

3   protected function.  So each of the elements of Count 1 are

4   established by the statement of offense.

5           Count 3 charges the defendant with a violation of

6   Title 18, United States Code, Section 111(a)(1).  The first

7   element of that charge is that the defendant assaulted,

8   resisted, opposed, impeded, intimidated, or interfered with

9   any officer or employee of the U.S. -- of the

10  United States -- or of any agency in any branch of the

11  United States government.

12          Paragraphs 12 and 14 of the statement of offense

13  establish that element.  Namely, paragraph 12 sets out an

14  assault of Officer B.S., and paragraph 14 discusses

15  defendant's participation in a physical push against the

16  officers in the lower West Terrace tunnel.

17          It's clear from the facts that the Metropolitan

18  Police Department was assisting officers of the

19  United States, namely, United States Capitol Police

20  officers, in defending the United States Capitol on

21  January 6th.

22          The second element of Count 3 is that the

23  defendant took that act with some use of force.

24  Paragraph 14 alleges that defendant took part in the last

25  push at the lower West Terrace tunnel and "presented an

1    immediate risk of injury to person or damage to property."

2    So the statement of offense also establishes the second

3    element of Section 111(a)(1).

4         The third element is that the defendant acted

5    while the officer or employee was engaged in or on account

6    of performance of official duties.  Again, this is

7    established by paragraph 14 of the statement of offense,

8    which discusses defendant's actions with respect to --

9    actually, Your Honor, I'm sorry, it's paragraph 12 of the

10   statement of offense, and paragraph 14, both of which

11   discuss the defendant's actions with respect to a specific

12   officer, Officer B.S., from the Metropolitan Police

13   Department, as well as other officers that were defending

14   the lower West Terrace tunnel on January 6th.

15        The last and final element of Count 3 is that the

16   assault involved physical contact with the victim or the

17   intent to commit another felony.  Once again, paragraphs 12

18   and 14 of the statement of offense also establish this

19   element in that they show that the defendant made physical

20   contact with Officer B.S. and pushed against officers at the

21   lower West Terrace tunnel.

22        Additionally, the statement of offense indicates

23   that he acted with the intent to commit another felony,

24   namely, civil disorder, which is the crime charged in

25   Count 1.

1           THE COURT:  All right.

2           Mr. Galetto, do you have it in front of you?

3           THE WITNESS:  Yes, Your Honor.

4           THE COURT:  Okay.  So let me go through it.  Let

5     me go through the background.

6           I assume that you will agree that the U.S. Capitol

7     is located in Washington, D.C., and it's secured 24 hours a

8     day by Capitol Police; that there are certain restrictions

9     and security barriers posted at various times; and that

10    appropriate identification is required in order to get into

11    the Capitol.

12          Would you agree with that?

13          THE WITNESS:  Yes, Your Honor.

14          THE COURT:  Would you agree that on January 6,

15    2021, that the exterior plaza of the Capitol was closed to

16    members of the public?

17          THE WITNESS:  Yes, Your Honor.

18          THE COURT:  Paragraph 3 is that:  On January 6,

19    2021, there was a Joint Session of the U.S. Congress

20    convened at the Capitol.  During the Joint Session, members

21    of the House of Representatives and Senate were meeting to

22    certify the vote count of the Electoral College of the 2020

23    presidential election, which had taken place on

24    November 3rd, 2020.  They began at around 1:00 p.m.  They

25    evidently -- they adjourned to separate chambers to resolve

1    a particular objection.  Vice President Mike Pence was

2    present and presiding in the Joint Session, and then later

3    in the Senate chamber relating to the objection.

4              Would you agree to all of that?

5              THE WITNESS:  Yes, Your Honor.

6              THE COURT:  Paragraph 4 is:  As the proceedings

7    continued in the House and Senate, and Vice President Pence

8    present and presiding over the Senate, that a crowd gathered

9    outside the Capitol.

10             There were temporary and permanent barricades

11   around the exterior, and Capitol Police officers were

12   present and were trying to keep the crowd from the Capitol

13   and from getting into the Capitol to disrupt the

14   proceedings.

15             Would you agree with that?

16             THE WITNESS:  Yes, Your Honor.

17             THE COURT:  Paragraph 5 is:  At about 2:00 p.m.,

18   some people in the crowd managed to get over the barricades.

19   U.S. Capitol Police officers were forced to retreat, and the

20   crowd advanced to the exterior of the building -- of the

21   Capitol Building.  They were not lawfully authorized to

22   enter or to get into the building, and any of the security

23   or weapons checks were not able to be conducted.

24             Would you agree with that?

25             THE WITNESS:  Yes, Your Honor.

```
1          THE COURT:  Six is:  At the time that the
2     certification proceedings were still underway, the exterior
3     doors, windows of the Capitol were locked and secured.
4     Capitol Police was attempting to maintain order, keeping the
5     crowd from entering the Capitol.
6          But around 2:00 p.m., certain members of the crowd
7     forced entry into the Capitol, breaking windows, assaulting
8     members of law enforcement, as they were encouraged, and
9     substantial damage was required [sic] -- actually, it's
10    2.8 million at this point.
11         Would you agree with that?
12         THE WITNESS:  Yes, Your Honor.
13         THE COURT:  All right.  And then, last, shortly
14    after that, around 2:20, members of the House and of the
15    Senate, including President of the Senate who was the Vice
16    President, were instructed, and did -- they evacuated the
17    chambers.  All proceedings of Congress including the Joint
18    Session were suspended until after 8 o'clock on January 6th
19    because of the dangerous circumstances caused by the
20    unlawful entry to the Capitol.  And the fact that there were
21    no security screenings and congressional proceedings could
22    not resume until later in the evening when the --
23    unauthorized occupants had been removed and the Capitol was
24    under control and secure again.
25         Would you agree with that?
```

1           THE WITNESS:  Yes, Your Honor.

2           THE COURT:  All right.  In terms of your specific

3   participation, as I understand it, you traveled by plane on

4   the day before, on January 5th, from your home in

5   Westminster, California, to Washington to attend the "Stop

6   the Steal" rally on January 6th.  "Stop the Steal" was a

7   rally of then-President Trump; is that correct?

8           THE WITNESS:  That's correct, Your Honor.

9           THE COURT:  In December of 2020, you told a group

10   of friends via text that you were going to Washington to

11   "Fight for their freedom."

12           Do you agree you did that?

13           THE WITNESS:  Yes, Your Honor.

14           THE COURT:  10 -- paragraph 10 is:  Around 2:40,

15   on January 6th, you approached the lower West Terrace, and

16   there is a tunnel entrance there that takes you into the

17   Capitol.

18           At the time you were wearing a black Trump

19   baseball hat, a black headband-ear warmer kind of thing, a

20   tan jacket, a gray hoodie as you entered the tunnel.  You

21   were one of the first individuals going inside the tunnel,

22   and you met with a large police presence who were trying to

23   keep out you and the larger crowd from that tunnel entrance

24   which would give you entrance into the Capitol Building.

25           Would you agree with that?

1           THE WITNESS:  Yes, Your Honor.

2           THE COURT:  Paragraph 11 is:  The crowd in the

3    lower West Terrace was significant and numbered well more

4    than three people, and you were part of that group.

5           You and others confronted the police officers in

6    the lower West Terrace in that tunnel entrance.  And they

7    were -- the officers were attempting to hold the crowd from

8    entering the Capitol through the tunnel.  In sum, there were

9    some that were engaged in acts of violence.

10          Would you agree with that?

11          THE WITNESS:  Yes, Your Honor.

12          THE COURT:  Okay.  And 12 is:  Evidence from a

13   body-worn camera of an MPD -- Metropolitan Police Department

14   officer, a D.C. officer, initials B.S., captured you at the

15   entryway doors of the lower west tunnel.

16          At approximately 2:43:26, the camera captured you

17   with your arms extended and pressed up against MPD officer

18   shields that they were holding up.

19          Is that accurate?

20          THE WITNESS:  Yes, Your Honor.

21          THE COURT:  And at approximately 2:44 and

22   14 seconds p.m., the body-worn camera also captured your

23   body pressed up against the officer shields.  And shortly

24   after that, at approximately 2:46 and 20 seconds p.m., the

25   body-worn camera captured a scuffle involving you and

1    Officer B.S., and Officer B.S. was knocked to the ground.

2              Would you agree with all of that?

3              THE WITNESS:  Yes, Your Honor.

4              THE COURT:  At approximately 2:46 --

5              MR. PORTALE:  Your Honor, may I --

6              THE COURT:  I'm sorry?

7              MR. PORTALE:  May I just speak briefly.

8              THE COURT:  Yes.

9              MR. PORTALE:  I just wanted to just clarify.  I

10   don't think it was ever alleged that -- because the way it's

11   written, it could be confusing.  I just want to make sure

12   that the Court and the record is clear that Mr. Galetto was

13   not ever formally accused of knocking Officer B.S. to the

14   ground.  It was that there was a scuffle --

15             THE COURT:  And he was -- as a part of that, he

16   wound up on the ground.

17             MR. PORTALE:  Yes.  Correct.

18             THE COURT:  That's the way I interpreted it.

19             MR. PORTALE:  I just wanted to make sure that the

20   record is clear and that Your Honor is clear that the

21   government did not formally accuse him of being the person

22   who knocked Officer B.S. to the ground.

23             THE COURT:  Is that correct, Government?

24             MS. KLAMANN:  I believe so, Your Honor.

25             MR. PORTALE:  Thank you, Judge.

```
 1                  I'm sorry to interrupt.

 2                  THE COURT:  No problem.

 3                  At approximately 2:46:28 p.m., the body-worn

 4        camera captured Mr. Galetto on one knee with a hand on the

 5        ground.  At approximately 2 minutes -- 2:47:02, you rose to

 6        your feet and retreated from the area of the tunnel; is that

 7        correct?

 8                  THE WITNESS:  Yes, Your Honor.

 9                  THE COURT:  So as I understand it, then, they

10        capture a scuffle involving you and the officer; the officer

11        falls to the ground.  And you, basically, are also on one

12        knee as a result of this scuffle, I take it, with your hand

13        on the ground, and then you get up.  Is that accurate?

14                  MR. PORTALE:  May I --

15                  THE COURT:  He has to say something, not you.

16                  MR. PORTALE:  Can I speak to him for a second?

17                  THE COURT:  No, no, no.

18                  Let him speak.  He can correct me if I'm

19        interpreting it wrong.

20                  MR. PORTALE:  Can I speak to him before he does?

21                  THE COURT:  Go ahead.

22                  MR. PORTALE:  Thank you.

23                  THE WITNESS:  Your Honor, I did not specifically

24        engage with this police officer.  I was knocked to the

25        ground due to the crowd.  The police officer was already on
```

1    the ground by the time I was on one knee.  In actuality, I

2    was trying to help him back up because he was screaming,

3    "Help me, help me, help me," at the time.  So I tried to --

4              THE COURT:  Let me go over this again.  In terms

5    of -- again, at approximately 2:44:14, the body-worn camera

6    captures your body pressed up against officer shields, the

7    plastic shields.  Is that accurate?

8              THE WITNESS:  That is accurate, yes, ma'am.

9              THE COURT:  Okay.  And then, shortly after that,

10   the camera captures what they have called a "scuffle"

11   involving you.

12             Is that correct or not?

13             THE WITNESS:  Yes, Your Honor.

14             THE COURT:  All right.  And as I also understand

15   it, this one particular officer was knocked to the ground by

16   somebody else, or in this scuffle where there are other

17   people, he wound up on the ground?

18             THE WITNESS:  That is correct.

19             THE COURT:  Which is correct?

20             THE WITNESS:  That he was knocked to the ground.

21   I was knocked to the ground.  We were both on the ground at

22   the same time, but it was not as a result of me physically

23   putting him on the ground.

24             THE COURT:  Is that acceptable to the government?

25   That's not the way I read this.

1          MS. KLAMANN:  Your Honor, that's not what is

2     written in the plea agreement.  As Your Honor read, it's

3     that the scuffle involved Officer B.S. falling to the

4     ground, and the defendant was also on the ground.

5          THE COURT:  The way it's written, and I think the

6     way -- in terms of, frankly, doing the elements of the

7     offense, you have to have been involved in the scuffle with

8     B.S., which -- I don't know whether others were involved in

9     the scuffle, but in a scuffle with B.S.  B.S. wound up -- I

10    am not suggesting you hit him, but he wound up -- as a

11    result of this, maybe he lost his balance or whatever -- but

12    he wound up on the ground.  You also wound up on the ground

13    as well.

14         THE WITNESS:  That's correct.

15         THE COURT:  Would you agree with that?

16         THE WITNESS:  Yes, Your Honor.

17         THE COURT:  Is that acceptable?

18         MS. KLAMANN:  Yes, Your Honor.  Thank you.

19         THE COURT:  Okay.  So paragraph 13 is:  As you

20    made your way inside the tunnel entrance -- as you made your

21    way from the inside to the tunnel entrance, you had shouted

22    to the crowd outside, "More people," in an attempt to get

23    more people to come into the tunnel entrance.  Is that

24    accurate?

25         THE WITNESS:  Yes, Your Honor.

1          THE COURT:  14 is, you remained at the tunnel for

2     over an hour and a half, and were part of the last pushes

3     against the officers at approximately 4:15; is that correct?

4          THE WITNESS:  Yes, Your Honor.

5          MR. PORTALE:  If I can just clarify that, too,

6     very briefly, if I may.

7          I just think that words are important; I want to

8     make sure because some of the way that these two paragraphs

9     are written are just a little confusing.

10          We have never alleged that Mr. Galetto remained in

11     the tunnel as part of a push for an hour and a half.  He was

12     outside it or around it.  He ended up going back into the

13     tunnel about an hour and a half later and was in the crowd

14     as the crowd pushed against officers.  But Mr. Galetto was

15     never accused of or caught on camera pushing -- physically

16     pushing against officers, and I think that that is

17     important.

18          THE COURT:  I don't think --

19          MR. PORTALE:  He was not part of the crowd -- part

20     of that push.

21          THE COURT:  Excuse me.

22          I didn't read this as he was -- I read it that he

23     was in the tunnel -- the tunnel is some distance -- for

24     around an hour and a half.

25          It doesn't say what you were doing there, but,

1    ultimately, you were involved in the last push at the

2    officers.  Is that accurate?

3              THE WITNESS:  Yes, Your Honor.

4              MR. PORTALE:  Thank you, Judge.

5              THE COURT:  All right.  And your extended presence

6    in the tunnel and your violent confrontation with the

7    officers, both pressing against the shields and this

8    scuffle, part of the crowd presented an immediate risk of

9    injury to person or damage to property.

10             The injury would be to the Capitol Police officers

11   and MPD officers that were trying to prevent people from the

12   crowd getting into the tunnel, which would give access to

13   the Capitol.

14             Would you agree with that?

15             THE WITNESS:  Yes, Your Honor.

16             THE COURT:  And then on the evening of

17   January 6th, you sent a text to someone on your cell phone

18   noting that "Politicians need to be overthrown," and that

19   Mike Pence "is a trader," which I assume you meant

20   T-R-A-I-T-O-R.

21             THE WITNESS:  Yes.

22             THE COURT:  Yes?  Would you agree?

23             THE WITNESS:  Yes, Your Honor.

24             THE COURT:  All right.  So the civil disorder

25   knowingly -- in other words, you know what you were doing;

1    this wasn't some accident -- committed an act or attempted

2    to commit an act with the purpose of disrupting, impeding,

3    or interfering with a law enforcement officer.  That would

4    be what occurred in paragraph 12, which is pushing against

5    the MPD officer shields, this scuffle, and then in 14, part

6    of the push -- the final push against them.

7         At the time of the act, the law enforcement

8    officer was engaged in his lawful performance incident to

9    and during a civil disorder.  So he -- this would have been

10   the officers -- in particular, Officer B.S. -- who were

11   there to provide security and to keep the crowd from getting

12   through the tunnel into the Capitol.

13        The civil disorder is, basically, you are

14   obstructing or interfering with the officer, which we have

15   indicated; so it's both elements 1 and 2.

16        And three is the civil disorder:  In any way or

17   degree obstructed, delayed, or adversely affected the

18   performance of a federally protected function.  And the

19   performance of the federally protected function was the vote

20   of the Electoral College, which they were -- MPD and Capitol

21   Police officers were trying to protect the Capitol so that

22   those functions could go on and that the crowd would not be

23   able to get in.

24        Count 3, that the defendant assaulted, resisted,

25   imposed, impeded, intimidated, or interfered -- I think

1    paragraphs 12 and 14 talk about both the scuffle and the

2    push against the shields -- the officers who had put them

3    up, obviously, to prevent you from going in.  And you

4    assaulted, you opposed, and you impeded and interfered with

5    their trying to keep the crowd from getting through the

6    tunnel into the Capitol; that you did it with some use of

7    force, which would have been both pushing against your body,

8    the shields, and the final push.  In paragraph 14, that the

9    defendant did so while Officer B.S. was engaged in his

10   official duties which -- he was on duty to prevent the crowd

11   from getting into -- past the tunnel into the Capitol; that

12   the assault involved physical contact with the victim which

13   would have been, presumably, the scuffle as well as -- the

14   scuffle in paragraph 12, it seems to me; as well as,

15   potentially, 14; and the intent to commit another felony,

16   which would have been -- the felony would have been the

17   civil disorder itself.

18          So I'll find that the government then has evidence

19   beyond a reasonable doubt of the elements of both the

20   charges in Count 1 and 3, and that Mr. Galetto has admitted

21   conduct that meets the elements of that offense.

22          Now, in terms of the written letter that sets out

23   the plea agreement, did you go over it carefully?

24          THE WITNESS:  Yes, Your Honor.

25          THE COURT:  Okay.  What I am going to do is -- as

1    I told you, I would go through portions of it.  I am going

2    to start with two things, which are consequences which

3    relate to the sentencing.  Set out here, although I will

4    discuss it slightly differently.

5            By statute, penalties, crimes, and charges have

6    statutory maximums as to what the penalties can be.  It's

7    unlawful to sentence above the maximums that are set out by

8    statute.

9            So for Count 1, it would be the civil disorder.

10   The maximum sentence for jail time is incarceration, five

11   years.  The maximum fine is $250,000 or two times the

12   pecuniary loss or gain.

13           Supervised release, if you are given a period of

14   jail time, you can be ordered to spend time supervised in

15   the community; it cannot be for more than three years.  If

16   you are given jail time and then supervised release -- if

17   you commit a new crime or violate the supervised release, in

18   terms of its conditions, it can be revoked.  If it is

19   revoked, then a new sentence is calculated based on statute

20   and the sentencing guidelines; then you will not get credit

21   for the period of time that you have already served on the

22   original offense; you would have to serve the full sentence.

23           Do you understand that?

24           THE WITNESS:  Yes, Your Honor.

25           THE COURT:  There is a special assessment which I

1      cannot waive; you need to pay $100.

2              Do you understand all of that?

3              THE WITNESS:  Yes, Your Honor.

4              THE COURT:  Now, in Count 3, which is the

5      assaulting, resisting, or impeding certain officers, the

6      maximum period of incarceration is eight years; the maximum

7      fine is $250,000, or two times the pecuniary loss or gain.

8      Supervised release -- again, if you are incarcerated and you

9      are put in the community, you can be monitored; it cannot be

10     for more than three years; and, again, the same thing if

11     it's revoked; and another $100 for the special assessment.

12             Do you understand and agree to all of that?

13             THE WITNESS:  Yes, Your Honor.

14             THE COURT:  Now, in terms of the sentencing

15     itself, there are certain factors by statute, 3553(a), and

16     some other sections that the Court needs to consider; they

17     are very broad.  They're basically your background

18     information, any rehabilitation needs, the seriousness of

19     the offense, just punishment, deterrence to you, deterrence

20     to others, those kind of broad things that the Court needs

21     to consider.

22             The probation office will prepare a presentence

23     report which will give -- set out the offense, give

24     background information about you.  We can also make a

25     recommendation.  And we'll also, importantly, do the

1    advisory sentencing guideline calculation; that will be the

2    official one that is done.

3            Once they do that, when this whole report is

4    prepared, it will be provided to your counsel and the

5    government; he can review it with you.  And if there are

6    objections, either you disagree with how they have done the

7    calculations or some other factual information there, you

8    can indicate that and object to the probation officer, who

9    will either change the report or will leave your objection

10   and indicate why not -- why they haven't changed it.  I will

11   resolve it before the sentencing goes forward.

12           So are you following me so far?

13           THE WITNESS:  Yes, Your Honor.

14           THE COURT:  So in terms of the advisory sentencing

15   guidelines, there is a commission that Congress set up that

16   is supposed to consider all of the things that a judge would

17   consider.  And it comes up with numbers, basically, that

18   reflect those considerations, in terms of the seriousness of

19   the offense, and they give a number to that.  Certain

20   characteristics of the offense may garner additional points,

21   or any of the other things that may reduce the points.

22           So for Count 1 the base offense is 10.  Because

23   there was physical contact, there is an additional three

24   points, which means that the offense level is 13.

25           Count 3, the base offense is 14.  Because there

1    was an official victim, which was the MPD officer, there is

2    an additional 6 points, which makes it 20.  So, combined,

3    you take the two offenses and you take the larger number,

4    which is the 20.

5            Because you have no convictions in terms of

6    looking at the criminal history, you will be in criminal

7    history 1.  The combined offense of 20 -- if you accept

8    responsibility, there can be a reduction of 2 points and

9    then an additional point if the government moves to allow

10   you that; so that is 17.  So if you are in offense Level 17,

11   Criminal History Category 1, the range and sentencing is 24

12   to 30 months.  The range of the fine is 10,000 to 95,000.

13           You should be aware that, in some circumstances --

14   although I am not sure in these types of offenses, if they

15   decide whether they are all connected, in which case you

16   would get -- I could not sentence you consecutively, it has

17   to be concurrent.  Let me just say that it's either

18   concurrent so the two counts -- if the sentence runs

19   together, there is a slim possibility it's consecutive,

20   where the Court can sentence you for one count and, on top

21   of that, the second count.  But I think because they're

22   related, the two offenses and counts, that it's probably

23   just going to be concurrent.

24           Now, the government has also indicated that there

25   is an enhancement which, so far, no judge has actually

1    imposed.  I assume it's what is labeled the terrorism one.

2            Is that correct, Government?

3            MS. KLAMANN:  Your Honor, I apologize.

4            Which portion of the plea letter are you referring

5    to?

6            THE COURT:  It's in the -- let me show you.

7            Where is it?  It's under -- page 5, second

8    paragraph under C, an upward departure.

9            MS. KLAMANN:  Your Honor, I believe that just

10   refers -- I don't believe that refers to a specific

11   enhancement that the government plans to seek.

12           I'm sorry, I don't have my guidelines book with me

13   or else I would confirm that.

14           THE COURT:  I assume that you spoke to -- Counsel,

15   you talked to your client.  Which one is it?

16           I meant to look it up as well.

17           MR. PORTALE:  Judge, I am 100 percent certain that

18   there has never been any mention of an upward variance or an

19   enhancement for anything.

20           THE COURT:  It's in here -- it's in your -- look

21   at page 5, the second paragraph.

22           MR. PORTALE:  Yes, Your Honor.

23           The way I see it, it says:  The government

24   reserves the right to request --

25           THE COURT:  Right.  I am saying -- he should just

1    know that the government may request it.

2            I am just asking:  What is it, the upward

3    departure?

4            MR. PORTALE:  Judge, if I may, maybe we should

5    take a minute to just verify it; I think that's probably the

6    best idea, because it's not something that we discussed.

7            THE COURT:  Well, what did you discuss with your

8    client?

9            Let me find it.  I had meant to look at it

10   beforehand, and I didn't get a chance to.

11           MS. KLAMANN:  Your Honor, I apologize.  You are

12   correct.  That is a reference to 381.4, a terrorism

13   enhancement.

14           THE COURT:  Right.

15           As I said, no judge has imposed it so far.

16           You should just be aware that they may ask for it.

17   Which, if they ask for it, you obviously can object, and the

18   Court would be making a decision about it.  But I wanted to

19   at least flag it so you are aware of it.

20           MR. PORTALE:  Thank you, Judge.

21           THE COURT:  All right.  Then, in looking at the

22   guidelines, the sentencing guidelines, within that network

23   you can ask for a departure.  They're very narrow because

24   the idea is the commission has come up with -- considered

25   everything that should be considered.  So they have to be

1    somewhat extraordinary or out of the ordinary in some way.

2    The departures are -- you can depart upward; you can add

3    points or depart downward, which is what you would be most

4    interested in.  As I said, they're very narrow.  Also,

5    because these are advisory, the Court is not bound by them.

6              I do need to make the calculation, but I can

7    decide that I will vary the sentence.  Obviously, I cannot

8    be above the statutory maximum, but I can vary either up or

9    down.

10             Now, according to our Court of Appeals, you have

11   to be very specific as to why the sentencing guideline range

12   does not satisfy the requirements of 3553(a) such that you

13   would move to a variance, but that is another option.  So

14   you do the calculations, and then there is some opportunity

15   to argue for a slightly different sentence based on either

16   the departures or the variance.

17             So do you understand all of that?

18             THE WITNESS:  Yes, Your Honor.

19             THE COURT:  Is that something you talked about

20   with your attorney?

21             THE WITNESS:  Yes, Your Honor.

22             THE COURT:  Okay.  Did you have a discussion with

23   him about what the guidelines are like?  How they apply?

24             Obviously, government counsel and defense counsel

25   came up with their best guess, in terms of what is in the

1   plea letter, but the official one is really going to be what

2   probation puts together.

3               Did you have that discussion?

4               THE WITNESS:  Yes, Your Honor.

5               THE COURT:  Do you understand that I won't be able

6   to decide the advisory guideline sentence until after I get

7   the presentence report, after everybody has had an

8   opportunity to either object or not, and to basically make

9   whatever arguments that you and your counsel and the

10  government make me to decide what the official guideline

11  range is?

12              Do you understand and agree?

13              THE WITNESS:  Yes, Your Honor.

14              THE COURT:  And then, as I said, after I have

15  decided what guideline applies, I have the authority, in

16  some circumstances, to impose a sentence that's more severe

17  or less severe than what is in the advisory guidelines.

18  Those are those departures that I spoke about.

19              Also, I am also required to tell you this, that

20  parole has been abolished.  So if you are sentenced to

21  prison, you actually serve the sentence.  It used to be --

22  in the old days, you may have seen movies where people are

23  put on parole.  You would get a sentence and part of the

24  sentence -- if the parole commission allowed you to -- would

25  be for you to serve it in the community; and that would be

43

1    part of your incarceration sentence, you would be on parole.

2    They have abolished that.  Whatever sentence I give you of

3    incarceration, that's actually what you'll serve.

4         The Bureau of Prisons on its own, which has

5    nothing to do with me, has a program of good time credits.

6    And they may reduce, based on your good behavior, your

7    number of days but that's not something the Court does.

8         Do you understand that?

9         THE WITNESS:  Yes, Your Honor.

10         THE COURT:  Do you also understand -- because the

11    offense as to which you are pleading guilty to are felonies,

12    if I accept your plea, that that may deprive you of valuable

13    civil rights:  The right to vote, the right to hold public

14    office, the right to serve on a jury.  It depends on where

15    you live.  In some places it's a lifetime deprivation; other

16    places it's for a time period; in some places it doesn't

17    make any difference.  It depends on where you are living as

18    to what effect having a felony offense will have on you.

19         Do you understand and agree to all of that?

20         THE WITNESS:  Yes, Your Honor.

21         THE COURT:  All right.  Then let me move to the

22    letter itself, if you have it in front of you.

23         I am going to go and indicate the page and the

24    paragraph as I go through it.  Page 1 sets out what you are

25    charged with.  It sets out what the plea is and what the

1    statutory penalties are.  We then get into the elements on

2    page 2 and 3.

3              You have also indicated, in paragraph 4 on page 3,

4    that you are agreeing to allow law enforcement agents to

5    conduct an interview with you regarding the events around

6    January 6th prior to sentencing; is that correct?

7              Is that what you have agreed to?

8              THE WITNESS:  Yes, Your Honor.

9              THE COURT:  Additional charges -- you have

10   indicated that, obviously, the other charges that you are

11   not pleading guilty to will be dismissed.  And that if you

12   have told them about any nonviolent criminal offenses that

13   you would have committed that they did not know about, they

14   will not charge you with those.

15             Moving to page 4, it sets out the guideline

16   calculations that we just talked about; the acceptance of

17   responsibility or being able to reduce it; the fact that the

18   estimated offense level, 17, after the -- if you do a

19   deduction of the 3 points for acceptance of responsibility.

20             And then on page 5, it talks about, under C, the

21   guideline range for that offense level and criminal history.

22   Paragraph second, more importantly:  You are agreeing that

23   solely for the purpose of calculating the range neither a

24   downward nor upward departure from the guideline range is

25   warranted.  The government does preserve its right about

1    that one particular potential departure.

2              You are also agreeing that neither party will seek

3    a different offense level calculation, but you are able to

4    argue for a different criminal history category should it

5    turn out to be different.

6              Do you understand and agree?

7              THE WITNESS:  Yes, Your Honor.

8              THE COURT:  Also, do you understand that the

9    estimated guideline range that has been set out is not

10   binding on the probation office or the Court?

11             Do you understand and agree to that?

12             THE WITNESS:  Yes, Your Honor.

13             THE COURT:  Now, at the bottom of 5 -- obviously,

14   if you commit any conduct after this agreement that could

15   serve as an increase in your base offense or adjusted upward

16   departure -- obstructing justice, not appearing for court,

17   false statements, those kinds of things -- then you may wind

18   up with some increases to the base offense level.

19             Do you understand and agree?

20             THE WITNESS:  Yes, Your Honor.

21             THE COURT:  All right.  Page 6, the top.

22   Importantly, 8, you have agreed that a sentence within the

23   estimated guideline range would be considered a reasonable

24   sentence under that statute 3553(a).  But the parties agree

25   that either one of you may seek a variance that I spoke

1    about, and suggest the Court consider a sentence outside of
2    the guideline range based on those factors that I set out
3    under 3553(a).  So both of you have reserved the right to
4    ask for a variance.
5              Do you understand and agree?
6              THE WITNESS:  Yes, Your Honor.
7              THE COURT:  All right.  Under 9, on page 6, the
8    second paragraph, if you have agreed to something --
9    recommend something or not recommend something as part of
10   the plea, post sentencing -- so it's after the sentencing --
11   in front of the Bureau of Prisons or elsewhere, neither you
12   nor the government will be bound by those strictures that
13   have been put into the plea letter.
14             Also, the government is putting you on notice that
15   after sentencing they are not going to move to have your
16   sentence reduced for being cooperative, which would be this
17   Rule 35(b).
18             Do you understand and agree to all of that?
19             THE WITNESS:  Yes, Your Honor.
20             THE COURT:  All right.  At the bottom of 6, it
21   indicates that I can impose a sentence all the way up to the
22   maximum.  Obviously, above that would be an illegal
23   sentence.
24             Looking at page 7, again at the top, I want to
25   make sure you understand that you have no right to withdraw

1    the guilty plea if I impose a sentence set outside the

2    guideline range or if I don't follow the government's

3    sentencing recommendation or, frankly, your lawyer's

4    recommendation; and you and the government are bound by the

5    agreement regardless of the sentence that I impose.  Any

6    effort on your part to withdraw the guilty plea because you

7    are unhappy with the length of the sentence that I could

8    impose would be considered a breach of the agreement.

9              Do you understand and agree?

10              THE WITNESS:  Yes, Your Honor.

11              THE COURT:  Conditions of release.  We have

12    indicated that you can remain in the community as long as

13    you are compliant with the conditions.  If that changes,

14    it's possible that you -- between now and sentencing, it's

15    possible that you could be picked up and held.

16              Do you understand and agree?

17              THE WITNESS:  Yes, Your Honor.

18              THE COURT:  At the bottom, in terms of statute of

19    limitations, this would only come up if the agreement is

20    vacated, in other words, made null and void.  If that's the

21    case, then -- by statute, most crimes have a period of time

22    within which the government has to charge you.  If they

23    charge you outside of that time period, you have a defense

24    saying they have charged you outside of the statute of

25    limitations and they can't do that; they can't proceed with

1   the prosecution.

2           So if at the time that we're entering this plea

3   the statute of limitations has not run, in other words, they

4   have charged you within that period of time but at some

5   later date the plea is vacated, made null and void, but the

6   government wants to go ahead and charge you again, you are

7   agreeing that you will not raise a statute of limitations

8   defense if, from the time of the plea and after it's

9   vacated -- if the statute of limitations has run.

10          Do you understand and agree?

11          THE WITNESS:  Yes, Your Honor.

12          THE COURT:  If you don't understand -- it's

13   basically to not have people plead guilty, it's vacated, and

14   then you try and withdraw the plea or have it vacated --

15          THE WITNESS:  I see.

16          THE COURT:  -- and then claim, oh, look; although,

17   originally, when you were charged, it was in the statute of

18   limitations, in the meantime, it has run.  That's the

19   purpose of it.

20          THE WITNESS:  So it's not the other way around,

21   they can charge me some other future charge that they didn't

22   come up at this particular plea bargain, correct?

23          THE COURT:  Right.

24          THE WITNESS:  Okay.  I understand that.

25          THE COURT:  All right.  In terms of trial rights,

1    which is page 8, I have gone over them.  The only one is the

2    second sentence:  You are agreeing to forgo the right to any

3    further discovery or disclosure of information that has not

4    already been provided to you.

5              Do you understand and agree?

6              THE WITNESS:  Yes, Your Honor.

7              THE COURT:  The second paragraph under that is

8    Rule 11(f) of the Federal Rules of Criminal Procedure and

9    410, Rules of Evidence.  Statements that you have made,

10   including the ones you have made today, that are admissions,

11   that if the plea is later withdrawn -- so if -- this is in

12   the circumstances it's withdrawn.  Ordinarily, under those

13   rules, if any admissions you have made could be used to

14   impeach your credibility.

15             So if you got up on the stand and testified to

16   something different than, say, what you said today or some

17   other time, they could use those statements, your

18   admissions, against you.  You are agreeing that they -- if

19   that occurs, that they can use it as direct evidence of what

20   you have said occurred.

21             Do you understand and agree?

22             THE WITNESS:  Yes, Your Honor.

23             THE COURT:  We went over the appeal rights.

24             Let's go to page 9, which talks about collateral

25   attack.  So this is another way of appealing; it's usually

1    done at a later date.

2            You are giving up your right to challenge, again,

3    the conviction or sentence or attempt to modify or change

4    the sentence or the manner in which it was decided in any

5    collateral attack, which is an indirect attack on a

6    conviction or sentence at a later point.

7            Some examples are 2255s, which is a writ of habeas

8    corpus.  Rule 60(b) is final judgment.

9            But there are exceptions.  The exception is such

10   that if it's a motion based on newly discovered evidence or

11   you're claiming that you received ineffective assistance of

12   counsel, then you would be able to do the appeal in this

13   collateral way.

14           You are also reserving your right to file a motion

15   under Section 3582(c)(2).  That is, if -- every once in a

16   while the commission revisits the advisory sentencing

17   guidelines.  If they, at some later date, lowered it for

18   your type of offense -- it depends on whether they would

19   hold that it's retroactive or not.  But if it was, you could

20   file to ask that the new guidelines which would give you a

21   lower sentence should be applied to you; but if it's denied,

22   then you can't take it up on appeal.

23           Do you understand and agree?

24           THE WITNESS:  Yes, Your Honor.

25           THE COURT:  All right.  And we can do video for

1    everything but the plea, which we are doing now, and any

2    sentencing.

3              Do you understand and agree?

4              THE WITNESS:  You said and any sentencing, so I

5    will have to --

6              THE COURT:  Yes.  For sentencing you will have to

7    come back; they are felonies.

8              THE WITNESS:  I understand.

9              THE COURT:  There are some differences with the

10   COVID procedures, but that has not changed.  Statuses and

11   things we can do by videoconference, but not the plea or the

12   sentencing itself.

13             THE WITNESS:  I understand.

14             THE COURT:  All right.  Page 10 is restitution.

15   You have agreed to restitution in the amount of $2,000,

16   which goes to the repairs that need to be done to the

17   Capitol; they're made to the Clerk of the Court.  And while

18   you have not paid the $2,000 restitution, you are required

19   to submit a financial statement or a financial disclosure

20   form to the U.S. Attorney's Office so that they can see --

21   in terms of whether you have money and should actually be

22   paying.  And you are authorizing the U.S. Attorney's Office

23   to get a credit report.  Now, once you have paid that off,

24   then there is no reason for you to have to do disclosures of

25   your finances.

1          The Court can also set a schedule so you don't

2    have to pay it all at once; it can be over a monthly period

3    of time.  The Court can do that.  The government can still

4    pursue and try and collect it more as a lump sum.

5          Do you understand and agree?

6          THE WITNESS:  Yes, Your Honor.

7          THE COURT:  All right.  Let's move to page 11.

8          THE WITNESS:  Can I ask one question?

9          THE COURT:  Sure.

10         THE WITNESS:  So the financial disclosure, I

11   guess, it is --

12         THE COURT:  Yes.

13         THE WITNESS:  -- that's only if I cannot pay --

14         THE COURT:  If you haven't paid it.

15         THE WITNESS:  Okay.

16         THE COURT:  In other words, they want to look at

17   your finances if you have not paid the -- until you have

18   paid the actual restitution.  So it's not an ongoing thing

19   that -- while you are sentenced that you are going to be

20   providing them with your financial information; it's really

21   only until your financial obligations, whatever they are,

22   are actually fulfilled or satisfied.

23         THE WITNESS:  I see.  Thank you for the

24   clarification.

25         THE COURT:  In terms of -- 15 is the breach of

1     agreement, if you break your end of the bargain.

2              Do you understand and agree that if you fail to

3     specifically perform or fulfill each of the obligations or

4     engage in any criminal activity before sentencing, you will

5     have been considered to have breached the agreement?

6              There are certain consequences.  The government is

7     free from its obligations under the agreement.  You will not

8     have a right to withdraw the guilty plea.  You will be fully

9     subject to criminal prosecution for any other crimes if you

10    commit them, such as perjury or obstructing justice.  The

11    government will be free to use against you, directly and

12    indirectly, in any criminal or civil proceeding, all

13    statements that you have made, any other information or

14    materials that you have provided, including what you have

15    done today or any other kinds of debriefings.

16              Do you understand and agree?

17              THE WITNESS:  Yes, Your Honor.

18              THE COURT:  In terms of the breach, the government

19    shall be required to prove a breach of the agreement only by

20    a preponderance of the evidence; so that is the standard in

21    Burton, which is at a civil lawsuit level; beyond a

22    reasonable doubt for criminal is, obviously, higher.  So

23    this is a lower level to prove the breach.  If the breach is

24    because you violated some federal, state, or local crime,

25    then they only have to prove it by probable cause to show

1    the breach; and that's even lower than preponderance of the

2    evidence.

3              Do you understand and agree?

4              THE WITNESS:  Yes, Your Honor.

5              THE COURT:  And then the paragraph -- the last

6    sentence in the third paragraph, under 15, you understand

7    that any perjury, false statements, declarations,

8    obstructing justice related to your obligations will be

9    viewed as a breach of the agreement; in other words, you

10   have broken your end of the bargain.  If that happens, you

11   won't be able to withdraw your guilty plea.

12             Do you understand and agree?

13             THE WITNESS:  Yes, Your Honor.

14             THE COURT:  Now, I want to make sure that we have

15   the full agreement, either in writing or what we have talked

16   about here.  You can't come back in a week or so and say,

17   well, Judge, I thought this or that was part of the

18   agreement.

19             I want to make sure that this is the complete

20   agreement, that there is nothing out there that you think is

21   part of it that has not been -- I haven't gone over

22   everything, but that has not been brought up in court orally

23   or in writing.

24             Is there anything?

25             THE WITNESS:  No, Your Honor.

1            THE COURT:  It also binds the agreement -- the

2       criminal and superior court divisions of the U.S. Attorney's

3       Office here in D.C. doesn't bind the civil division or any

4       other U.S. Attorney's Office.

5            Do you understand and agree?

6            THE WITNESS:  I agree.

7            THE COURT:  All right.  Now, my last question is

8       about -- goes to voluntariness of the plea.

9            Has anyone including your lawyer, law enforcement,

10      the prosecutor, or anybody else you have come in contact

11      with since your arrest promised or suggested to you that

12      just by pleading guilty that you are necessarily guaranteed

13      a lighter sentence?

14           Obviously, I will take into account your

15      acceptance of responsibility.  But I want to make sure no

16      one has guaranteed you a specific sentence.

17           THE WITNESS:  That's correct, no one has.

18           THE COURT:  Nobody --

19           THE WITNESS:  No.

20           THE COURT:  -- has anyone forced, threatened, or

21      coerced you in any way into entering this plea of guilty?

22           THE WITNESS:  No, Your Honor.

23           THE COURT:  Do you understand that the agreement

24      reached in this case resulted from negotiations between your

25      lawyer and the government's lawyer?

1              THE WITNESS:  Understood.

2              THE COURT:  Has anyone made any promises to you in

3    connection with your guilty plea other than those in the

4    plea letter or what we have spoken about today in court?

5              THE WITNESS:  The question is what?  I'm sorry.

6              THE COURT:  Has anyone made any promises to you in

7    connection with your guilty plea other than the plea letter

8    or what we have talked about here?

9              THE WITNESS:  No, Your Honor.

10             THE COURT:  Has anyone made any promises to you as

11   to what sentence I will impose in this case if I accept your

12   guilty plea?

13             THE WITNESS:  No, Your Honor.

14             THE COURT:  Do you understand that at this time I

15   don't know what sentence I will impose since I haven't heard

16   from the probation office or the attorneys?

17             Do you understand that?

18             THE WITNESS:  Yes, I do.

19             THE COURT:  Are you entering this plea of guilty

20   voluntarily and of your own free will?

21             THE WITNESS:  Yes, Your Honor.

22             THE COURT:  And are you entering this plea of

23   guilty because you are guilty of the two counts that you are

24   pleading to?

25             THE WITNESS:  Yes, Your Honor.

1          THE COURT:  Anything you don't understand about

2     the proceeding or your plea?

3          Anything you want to ask me or your counsel?

4          THE WITNESS:  No, Your Honor.

5          THE COURT:  I want to make sure that this is the

6     decision that you wish to make because, again, you can't

7     come back in a month or two and say:  I changed my mind,

8     Judge, I want to withdraw it.

9          I want to make sure this is what you want to do.

10          Are you sure that this is what you want to do?

11          THE WITNESS:  Yes.

12          THE COURT:  Then how do you, Kevin Louis Galetto,

13     plead to Count 1, civil disorder; guilty or not guilty?

14          THE WITNESS:  Guilty.  Guilty, Your Honor.

15          THE COURT:  And to Count 3, assaulting, resisting,

16     or impeding certain officers; guilty or not guilty?

17          THE WITNESS:  Guilty, Your Honor.

18          THE COURT:  All right.  I am satisfied the

19     defendant, Mr. Galetto, is fully competent and capable of

20     making a decision today, understands the nature and

21     consequences of what he is doing.  He is acting voluntarily,

22     of his own free will, and it's an adequate factual basis for

23     his plea.  Therefore, the plea is accepted.

24          The Court finds Kevin Louis Galetto guilty of

25     Count 1, civil disorder; Count 3, assaulting, resisting, or

```
 1    impeding certain officers.
 2            All right.  I will leave your conditions of
 3    release as they are now.
 4            THE WITNESS:  Thank you, Your Honor.
 5            THE COURT:  Let me sign the waiver of trial.
 6            Dorothy, what is the presentence date?  When would
 7    be when it's done?
 8            THE COURTROOM DEPUTY:  June 18th.
 9            THE COURT:  18th?
10            THE COURTROOM DEPUTY:  Yes.
11            THE COURT:  That's a Sunday.  So let me give them
12    until June 23rd, we have quite a few cases, so they don't
13    ask for extensions.
14            Do you want the government to go first and then
15    you second, or do you want to file simultaneously?
16            THE WITNESS:  What's the question, Your Honor?
17            THE COURT:  It's for your lawyer.
18            Do you want to file simultaneously or have the
19    government go first and you second?
20            MR. PORTALE:  Your Honor, I think that
21    simultaneous in this case is fine.
22            THE COURT:  All right.  Come up with a date.
23            June 23rd is when I get it.  So you would have
24    looked at it beforehand, made any objections, done whatever
25    needs to be done.
```

1              From the 23rd -- how much time do you want after

2      that?  Give me a date that you are going to stick to.

3              MR. PORTALE:  May we have 30 days from there,

4      Judge?

5              THE COURT:  Okay.  So are you talking about

6      July 21st?

7              MR. PORTALE:  Yes, Your Honor.

8              THE COURT:  Give me another date if you want

9      something else.  I would like you to stick to it as much as

10     possible.

11             MR. PORTALE:  If it's going to be an issue -- if

12     we do need more time, maybe we should take August 4th, if

13     that pleases the Court.

14             THE COURT:  No.  As I said, I would rather you

15     file -- that you don't ask for extensions.  I get a lot of

16     extensions; I would rather give you what you need.

17             So both the government and the defense memorandum

18     in aid of sentencing will be filed then.  Let me see -- look

19     and see what's available for an actual sentencing date.

20             (Whereupon, the Court and staff confer.)

21             THE COURT:  Do you have a preference of either

22     Monday the 7th or Tuesday the 8th for the sentencing?  I

23     start a trial on the 9th.  How about the 8th?  Just

24     because -- the other one is finishing on the 4th, just in

25     case there is a little overlap.

1          MR. PORTALE:  Judge, the month is August?

2          THE COURT:  Yes.

3          MR. PORTALE:  I don't have a preference, Judge.

4          THE COURT:  Is that okay?

5          So August 8th.

6          Where are you all coming from?

7          THE WITNESS:  Florida.

8          MR. PORTALE:  New York.

9          THE COURT:  I can do it in the afternoon, if you

10   want.

11          MR. PORTALE:  Please.

12          THE COURT:  1:30.  Does that work?

13          MR. PORTALE:  Yes, Your Honor.

14          THE COURT:  All right.  So the presentence report

15   coming to me is June 23rd.  Both counsel will file

16   simultaneously on August 4th a memorandum in aid of

17   sentencing.  The sentencing is August 8th, at 1:30.

18          MR. PORTALE:  Thank you, Your Honor.

19          THE COURT:  What I would ask is, the government --

20   you, generally, have been providing me with videos, which

21   helps.  If you would do it --

22          I forgot, Dorothy, what we want.  How do we do it?

23   Do you remember.

24          (Whereupon, the Court and staff confer.)

25          THE COURT:  If you can, give them to us on a thumb

 1    drive.

 2              MS. KLAMANN:  Sure, Your Honor.

 3              THE COURT:  Along with -- if you can give it

 4    before the sentencing, that would be great, because it's

 5    very close between when you give your memorandum in aid of

 6    sentencing.

 7              MS. KLAMANN:  Sure, Your Honor.

 8              THE COURT:  All right.  If there is nothing else,

 9    then the parties are excused.

10              Anything else that needs to be discussed?

11              MR. PORTALE:  I did have one more thing.  Forgive

12    me if you think I am being overly cautious or overly

13    worrisome --

14              THE COURT:  Okay.

15              MR. PORTALE:  -- but it's been, kind of, a pebble

16    in my shoe since we went through the allocution.

17              I just want to make sure that we're all on the

18    same page as to what Mr. Galetto admitted to with regard to

19    "physical contact."  I think I understand, but I want to

20    make sure that Your Honor is clear and that we're all clear

21    on it.

22              THE COURT:  I assume that the body-worn camera is

23    going to show what happened.  No?

24              MR. PORTALE:  Yes.  It's going to show -- counsel

25    can feel free to chime in.  It's going to show Mr. Galetto

62

1    clearly grabbing the officer's shield, and that that is the

2    understanding of -- that's what the physical contact is.

3              I just keep going back to where we were with

4    regard to that scuffle.  And I am worried that it sounded

5    like Mr. Galetto was admitting to having made contact at

6    that time, and I want to make sure that that is clear.

7              I'm sorry if I should have interrupted you at that

8    time and I shouldn't have waited, but it's been, kind of,

9    sitting with me.  I want to make sure --

10             THE COURT:  Well, I thought we had clarified it on

11   the record, and I will go back and take a look at what we

12   have.

13             We have him pushing the shields.

14             MR. PORTALE:  Yes.

15             THE COURT:  And then we have what is described as

16   a scuffle between he and the officer which, I assume, shows

17   up.

18             MR. PORTALE:  No.  That's why I'm worried.  That's

19   what I want to clarify.

20             THE COURT:  One at a time.  What are you defining

21   as a "scuffle"?  I assume there is some physical contact.

22   It's clear he didn't hit him and knock him to the ground.

23             MR. PORTALE:  I think what happened was that there

24   was a scuffle between many people.  It's almost like a rugby

25   scrum, if you will.  He was there -- not on camera.  The

1    officer was there, not really on camera; they both go down.

2    It never has been alleged that he was -- that the officer

3    fell as a result of contact with Mr. Galetto.  It's never

4    been --

5              THE COURT:  There is -- some physical contact I

6    assume was had.

7              MR. PORTALE:  With Mr. Galetto and the officer's

8    shield.  That's clear.  That's clear.  We have done --

9              THE COURT:  So separately, from pushing on the

10   shield.  You are talking about the officer and Mr. Galetto

11   individually with the officer's shield; that's the scuffle.

12             MR. PORTALE:  And that's the physical contact that

13   meets the element under the 111 element for physical

14   contact.  I am so glad that I brought it back up, and I

15   apologize if I didn't do it sooner.

16             THE COURT:  Does the government agree with that?

17             MS. KLAMANN:  Your Honor, I think paragraph 17 of

18   the statement of offense clarifies that, and it speaks

19   directly to the elements of 111(a).  Specifically, it says:

20   Defendant admits that he pushed up and against the riot

21   shield of MPD Officer B.S.  So I think we're on the same

22   page.  That is the physical contact for purposes of the plea

23   today.

24             To the extent there is additional physical

25   contact, I expect the government would prove that up at

1    sentencing.

2              THE COURT:  Okay.

3              MR. PORTALE:  That helps, Judge.  And thank you.

4    Thank you for entertaining me.

5              THE COURT:  No, no.  It's much better to take care

6    of it now than it is to get stuck at sentencing with

7    arguments about what did or did not happen.

8              MR. PORTALE:  Thank you, Judge.

9              I think I was mostly worried about if your

10   understanding was one thing and us saying something else in

11   our memo, and then it looking like we were trying to change

12   things; that was my concern.

13             THE COURT:  Okay.

14             MR. PORTALE:  Thank you so much.

15             THE COURT:  All right.  The parties are excused.

16             MR. PORTALE:  Thank you, Judge.

17             (Whereupon, the proceeding concludes, 4:00 p.m.)

18                         **CERTIFICATE**

19             I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
     certify that the foregoing constitutes a true and accurate
20   transcript of my stenographic notes, and is a full, true,
     and complete transcript of the proceedings to the best of my
21   ability.
               This certificate shall be considered null and void
22   if the transcript is disassembled and/or photocopied in any
     manner by any party without authorization of the signatory
23   below.

24        Dated this 30th day of July, 2023.

25        /s/ Elizabeth Saint-Loth, RPR, FCRR
          Official Court Reporter