# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case. No. 21-cr-517 (CKK)** |
| | ) | |
| **KEVIN LOUIS GALETTO** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPLY IN SUPPORT OF MOTION FOR REDUCTION OF SENTENCE

In November 2023, Kevin Galetto filed a pro se motion to reduce his sentence under 18 U.S.C. § 3582(c), pursuant to Amendment 821's retroactive two-point reduction for certain zero-point offenders. *See* Dkt. 71. The government opposed Mr. Galetto's motion. *See* Dkt. 73. Undersigned counsel has since entered an appearance and is filing this reply on Mr. Galetto's behalf.

Mr. Galetto moved this Court to reduce his term of imprisonment from 27 months' imprisonment to 21 months' imprisonment (modifying his projected release date from approximately August 8, 2025, to February 8, 2025), due to a retroactively applicable amendment to the U.S. Sentencing Guidelines impacting so-called "zero-point offenders." *See* Amend. 821 (Part B), U.S.S.C. (eff. Nov. 1, 2023). The government opposes this motion, contending that Mr. Galetto is ineligible for the reduction under U.S.S.G. § 4C1.1(a)(3), and that even if he is eligible, his sentence should not be adjusted in light of the 18 U.S.C. § 3553(a) factors. *See* Dkt. 73. As

1

explained herein, because Mr. Galetto lacked the intent to harm or cause injury to another, he did not "use violence" under § 4C1.1(a)(3), and the modest sentence reduction serves the purposes of sentencing set forth in § 3553(a).

## **Relevant Background**

On March 20, 2023, Mr. Galetto pleaded guilty to two felony offenses arising from the events January 6: 18 U.S.C. § 231(a)(3) (civil disorder), and 18 U.S.C. § 111(a) (assault on a federal officer).  *See* Dkt. 57 at 2-3.  At the time, the U.S. Sentencing Guidelines recommended 24 to 30 months' incarceration.  *See* PSR ¶ 88. On September 5, 2023, this Court sentenced Mr. Galetto to 27 months' imprisonment on each count to be served concurrently, followed by 24 months of supervised release. *See* Dkt. 69 at 2-3 (Judgment); Sept. Sent'g Tr. at 22:12-16.[1]  At sentencing, the Court declined to rule on the applicability of the zero-point offender reduction as Amendment 821 had not yet gone into effect.  *See* Sept. Sent'g Tr. at 19:3-20:1.

Mr. Galetto presently is incarcerated at Jesup FCI in Jesup, Georgia.  As of this writing, his projected release date is August 8, 2025, per the Bureau of Prison's inmate locator.  *See* https://www.bop.gov/inmateloc/.

---

[1] This Court first attempted to sentence Mr. Galetto on August 8, 2023, but a factual dispute arose during that hearing, and so the Court continued the sentencing hearing to September 5, 2023.  *See* Min. Entry (Aug. 8, 2023); Aug. Sent'g Tr. at 36:21-25.

## Argument

### I.   Applicable Legal Standards

Effective November 1, 2023, the United States Sentencing Commission created a new guideline provision relating to criminal history at U.S.S.G. § 4C1.1 (Adjustment for Certain Zero-Point Offenders).  Section 4C1.1 provides for a two-level decrease from the offense level for defendants who did not receive any criminal history points so long as they meet the following criteria:

1. the defendant did not receive any criminal history points from Chapter Four, Part A;

2. the defendant did not receive an adjustment under §3A1.4 (Terrorism);

3. the defendant did not use violence or credible threats of violence in connection with the offense;

4. the offense did not result in death or serious bodily injury;

5. the instant offense of conviction is not a sex offense;

6. the defendant did not personally cause substantial financial hardship;

7. the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

8. the instant offense of conviction is not covered by §2H1.1 (Offenses Involving Individual Rights);

9. the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense); and

10. the defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848[.]

U.S.S.G. § 4C1.1(a). On August 31, 2023, implementing the directive of 28 U.S.C. § 994(u), the Sentencing Commission determined that the new § 4C1.1 would apply retroactively to defendants serving terms of imprisonment. *See* United States Sentencing Commission, Amendment to the Sentencing Guidelines (Aug. 31, 2023)[2]; *see also* U.S.S.G. § 1B1.10 & app. n.7.

18 U.S.C. § 3582(c)(2) provides that defendants serving terms of imprisonment may receive sentence reductions pursuant to retroactive amendments to the Sentencing Guidelines:

> [I]n the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. § 994(o), upon motion of the defendant or the Director of the Bureau of Prisons, or on its own motion, the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(2). In turn, U.S.S.G. § 1B1.10 – the applicable policy statement – states that:

> In a case in which a defendant is serving a term of imprisonment, and the guideline range applicable to that defendant has subsequently been lowered as a result of an amendment to the Guidelines Manual listed in subsection (d) below, the court may reduce the defendant's term of imprisonment as provided by 18 U.S.C. § 3582(c)(2).

---

[2] Available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202308_RF-retro.pdf.

U.S.S.G. § 1B1.10(a)(1).  Section 1B1.10 further provides that, except under certain circumstances, a court may not reduce a person's sentence "to a term that is less than the minimum of the amended guideline range," and "[i]n no event may the reduced term of imprisonment be less than the term of imprisonment the defendant has already served."  U.S.S.G. § 1B1.10(b)(2).

Courts evaluate a motion under 18 U.S.C. § 3582(c)(2) in two steps.  *See United States v. Bauer*, No. 21-cr-3862 (TNM), 2024 WL 324234, at *2 (D.D.C. Jan. 29, 2024) (citing *United States v. Wyche*, 741 F.3d 1284, 1292 (D.C. Cir. 2014)).  "First, the Court determines whether the defendant is eligible for a reduced sentence and, if so, calculates the amended Guidelines range."  *Id.* (citing *Dillon v. United States*, 560 U.S. 817, 826-27 (2010)).  "Second, the Court must 'consider any applicable § 3553(a) factors and determine whether, in its discretion, the reduction authorized by reference to the policies relevant at step one is warranted in whole or in part under the particular circumstances of the case."  *Id.* (quoting *Dillon*, 560 U.S. at 827).

## II.   **Mr. Galetto is eligible for the zero-point offender reduction.**

Mr. Galetto is eligible for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(2) and § 1B1.10.  As explained, after Mr. Galetto's sentencing, the Sentencing Commission retroactively amended the sentencing guidelines to reduce the total offense level by two levels for defendants without any criminal history points, so long as the offense did not involve any of the listed exclusionary conditions.  *See* U.S.S.G. § 4C1.1(a).  Mr. Galetto had no criminal history points at sentencing.

5

*See* PSR ¶¶ 57-59.  But the government argues that Mr. Galetto is not eligible for the reduction "because his offense involved his personal use of violence or credible threats of violence against a person or property" per § 4C1.1(a)(3).  Dkt. 73 at 6.  Not so.[3]

Mr. Galetto's conduct did not involve "violence" under § 4C1.1 because he lacked the intent to injure or harm another.  *See, e.g.*, *United States v. Yang*, No. 23-cr-100 (JDB), 2024 WL 519962, at *4 (D.D.C. Feb. 9, 2024) (finding that January 6 defendant's physical contact with officers did not disqualify him from receiving the zero-point offender reduction in part because "this contact was not made with an intent to harm").  As this Court noted in *United States v. Hernandez*, "the term 'use violence' is undefined by the Sentencing Guidelines," and so "the court may rely on dictionary definitions to determine meaning."  Dkt. 65 at 5, *United States v. Hernandez*, 21-cr-445 (CKK).  The Court then cited approvingly the dictionary definitions Judge McFadden employed in *United States v. Bauer*, determining that "violence is: 'the use of physical force typically accompanied by fury, vehemence, or outrage, and unlawfully exercised **with the intent to harm**,' or the 'exertion of any

---

[3] At sentencing, the Court suggested that the zero-point offender reduction might not apply to Mr. Galetto because his actions on January 6 could be considered violent. *See* Sept. Sent'g Tr. at 19:3-20:1.  The Court noted, however, that this would "depend[] on how [the Sentencing Commission] define[s violence] and how they set that out." *Id.* at 19:7-8.  The Court accordingly declined to "mak[e] any ruling at th[at] point" on Mr. Galetto's eligibility. *Id.* at 19:4-5.  For the reasons explained herein, because "violence" under § 4C1.1(a)(3) requires an intent to cause injury, Mr. Galetto's actions do not fall within this exclusion.

physical force **so as to injure or abuse**.'" *Id.* (quoting *Bauer*, 2024 WL 324234, at *2) (emphasis added); *see also Yang*, 2024 WL 519962, at *4 (similar).

Judge Bates's opinion in *Yang* is demonstrative.  There, Mr. Yang, a January 6 defendant, "stood near the front of the crowd close to the police line" in the Rotunda. *Yang*, 2024 WL 519962, at *1.   While his "body language was generally nonconfrontational," Mr. Yang did "make physical contact with officers twice."  *Id.* First, "[w]hen a scuffle broke out nearby, officers surged forward and Yang briefly grabbed an officer's wrist."  *Id.*  Second, "[w]hen an officer approached from the side and pushed Miller[, another member of the crowd,] firmly with a baton, Yang," who was holding Miller, "briefly grabbed the baton as Miller fell backward."  *Id.*  Judge Bates concluded that Mr. Yang's actions did not constitute "violence" within the meaning of § 4C1.1.  *Id.* at *4.  While Mr. Yang may have used "physical force" in that "he briefly made physical contact with two officers, the Court f[ound] that *this contact was not made with an intent to harm*."  *Id.* (emphasis added).  "Nor[,]" the Court continued, "was this contact accompanied by 'fury, vehemence, or outrage,' or the like."  *Id.*  Thus, even though Mr. Yang was "near the front of the crowd opposing the line of officers," and twice made physical contact with officers, the Court concluded that "Yang did not act with the degree of aggression necessary to fairly characterize his actions as 'violence.'"  *Id.*

Similarly, in *United States v. Pineda-Duarte*, 933 F.3d 519, 523 (6th Cir. 2019), the Sixth Circuit interpreted the phrase "used violence" within a different section of

the Guidelines, § 2D1.1(b)(2), which increases the offense level for drug-related crimes where "the defendant used violence, made a credible threat of violence, or directed the use of violence." As in the zero-point offender cases, the court looked to dictionary definitions and held that "'violence' encompasses acts where one uses physical force *with the intent to injure*." *Id.* (emphasis added); *see also id.* ("We know that the phrase 'made a credible threat to use violence' . . . applies where a defendant credibly communicates *the intent to injure a person* but has not yet acted upon that intent[.]") (emphasis added); *id.* at 523-24 ("[W]e know that the companion phrase 'used violence' applies when a defendant *formed the intent to injure* a person and did injure that person[.]") (emphasis added). In *Pineda-Duarte*, the defendant "moved the shovel he was holding toward an officer when police announced their presence." *Id.* at 525. The parties disputed, however, whether the defendant "sw[ung] that shovel with the intent to harm," or whether he swung it "reflexively in the direction of another with no intent to cause any injury." *Id.* The court remanded on that issue, stating that "Pineda's intent . . . is crucial to determining whether Pineda 'used violence.'" *Id.*

Tying these cases and definitions together produces a controlling takeaway: the use of "violence" requires an intent to harm or injure another; mere physical contact or use of force is not sufficient. And that takeaway is fatal to the government's argument in this case.

Mr. Galetto did not have the requisite intent to physically injure another person on January 6. The government relies primarily on Mr. Galetto's interaction with Officer B.S. in the tunnel. *See* Dkt. 73 at 6-7. This incident can be viewed at Sentencing Exhibit 3.2. After careful review of the video and other evidence going to Mr. Galetto's state of mind, it becomes clear that he did not intent to hurt or injure Officer B.S. or any other officers that day.

At approximately 2:43 p.m., Mr. Galetto can be seen on video near Officer B.S.'s shield (Mr. Galetto is the individual wearing a tan jacket, black headband, and gray sweatshirt, *see* PSR ¶ 28). Starting around 00:39 of Exhibit 3.2, a large group of people can be seen pushing behind Mr. Galetto. In the seconds that follow, Mr. Galetto is pressed up against Office B.S.'s shield. Around the 00:45-1:00 minute mark, Mr. Galetto's facial expression and body language appear to display discomfort and fear as his face is thrust towards Officer B.S.'s shield. *See, e.g.*, Aug. Sent'g Tr. at 33:21-25 ("I did have my hands on a shield at first to push and then to balance myself to keep from falling" and "from being pressed directly into the shield by the surging mob."). As Mr. Galetto's trial counsel described it:

> From 2:43:55 a wave comes in, and it appears, if you look at it, that Mr. Galetto is being pushed up and splayed with his hands out against the shield. I would suggest to you this is not how one would press and apply force against the shield. His face is right up against the shield. . . . You know, he's being pushed by a surging crowd.

*Id.* at 16:4-11. Around the 1:19 mark, Mr. Galetto attempts to step away from the police line (including making a significant step away from Officer B.S. around minute

1:37), but he is unsuccessful when two individuals next to him push their arms past

Mr. Galetto towards Officer B.S.  Around minute 1:48, the force of the crowd pushes

Mr. Galetto's back against Office B.S.'s shield.[4]

The video does not fully capture what happens next, but the Court described

the subsequent events as follows:

> At approximately 2:46:20 the body worn camera captured a scuffle
> involving Mr. Galetto.  Mr. -- there is no evidence and there's nothing
> in the statement that suggests that Mr. Galetto in any way hit
> [Officer B.S.] or specifically knocked him to the ground, but Officer
> B.S. was -- did wind up on the ground.  At approximately 2:46:20 p.m.,
> the body worn camera captured Mr. Galetto on one knee with a hand
> on the ground.  At approximately 2:48:02[,] Mr. Galetto rose to his
> feet and retreated from the area of the tunnel.

Sept. Sent'g Tr. at 11:9-17.  This moment was the subject of confusion at sentencing,

but by the September hearing, the parties agreed that a different member of the

crowd actually hit Officer B.S., and that Mr. Galetto was not involved in that specific

assault.  *See* Sept. Sent'g Tr. at 4:11-13.  The government maintained, however, that

"Mr. Galetto was pushing and shoving against Officer B.S.'s shield causing him to

fall."  Sept. Sent'g Tr. at 13-15.  Mr. Galetto contended that "[j]ust prior to Officer

B.S. being knocked down . . . there was a moment where I was able to turn my body

in an attempt to exit the tunnel."  Aug. Sent'g Tr. at 33:2-5.  He continued: "As I

---

[4] At sentencing, the Court stated: "I think it's ambiguous as to whether he turned
around to leave, since he doesn't leave, or whether he turned around because he could
push back against the officers with his back," and so the Court viewed that issue "in
equipoise" without resolving whether Mr. Galetto was trying to leave.  Sept. Sent'g
Tr. at 16:1-8.  Mr. Galetto maintained that at that moment, he was trying to exit the
tunnel.  *See* Aug. Sent'g Tr. at 33:2-7.

moved away from the front, I was quickly turned around by a surging crowd and trapped with my back against the officers.  It was then that someone else caused Officer B.S. to fall.  I was also knocked to the ground in a wave." Aug. Sent'g Tr. at 33:5-9.  The Court concluded: "There's nothing that I've indicated nor has the government suggested that anything other than the pushing and pulling in terms of Mr. Galetto's role in why [Officer B.S.] fell to the ground." Sept. Sent'g Tr. at 15:6-9.

Notably, in describing the events in the tunnel, the Court did not state that Mr. Galetto intended to hurt or injure Officer B.S.  And indeed, there are facts affirmatively pointing the other way.  For example, after both Officer B.S. and Mr. Galetto fall to the ground, Mr. Galetto is up on one knee above Officer B.S.  *See* Sent'g Ex. 3.2 at 3:12-3:32.  Had Mr. Galetto intended to injure the officer, he would have used that position of power to attack him; instead, he simply kneels there.  *See* Dkt. 65 at 19 (Def's Sent'g Memo) (noting that "Mr. Galetto had multiple opportunities to commit acts of violence," including "when he was forced down to one knee, hunched over the then-prone MPD Officer B.S.," but "rather than contacting MPD Officer B.S. in any way, Mr. Galetto deliberately kept his body weight up and avoided contacting the officer in an obvious effort to protect him.").[5]

---

[5] At sentencing, the Court did not agree with Mr. Galetto that he was attempting to protect Officer B.S. at this moment.  *See* Sept. Sent'g Tr. at 15:17-19.  But at the very least, Mr. Galetto did not use his physical position over Officer B.S. to attempt to hurt him.

Moreover, unlike many of the people around him that day, Mr. Galetto did not throw punches or pick up weapons during his time at the Capitol. *See id.* at 11 ("At no point in time did he or has he ever harbored the intent to strike or harm police, despite the many ill-intentioned people all around him swinging fists or weapons or throwing things at the police."). Compare his actions with the cases the government cited as "suitable comparisons" to Mr. Galetto's case at sentencing, for example. Dkt. 64 at 29; *see United States v. Sargent*, No. 21-cr-258 (TFH) (14-month sentence for defendant near front of crowd who twice swung an open hand at an officer, once making contact, who bragged about hitting the officer afterwards); *United States v. Hernandez*, No. 22-cr-42 (CRC) (24-month sentence for defendant who struck an officer with a flagpole). That Mr. Galetto did not engage in the sort of actions that would be most likely to cause physical injury (such as punching or using a weapon) is very strong evidence that he did not *intend* physical injury. As Mr. Galetto stated at sentencing:

> I can tell you with absolute conviction that I never had any intention of engaging in any acts of violence although I was surrounded by it. I brought no tools, no weapons, nothing to Washington, no protective gear. I never hit or swung or struck anyone despite having every opportunity to do so.

Aug. Sent'g Tr. at 32:14-19.

The government also relies on Mr. Galetto's "indirect contact" with officers, arguing that by pushing against other rioters in the tunnel who then pushed against the police line, Mr. Galetto "used violence" against those officers at the other end. *See*

Dkt. 73 at 7-8. But, as with the interaction with Officer B.S., there is no indication that Mr. Galetto intended to injure or harm those officers. Rather, at worst, it seems Mr. Galetto's goal was to assist the crowd with entering the Capitol to stop the certification of the election. *See, e.g.*, Aug. Sent'g Tr. at 31:7-9. To be sure, those actions were wrong, and Mr. Galetto will still be punished heavily for that conduct even if this Court grants his motion. But there is a difference between those rioters who wished to enter the Capitol under a flawed belief that the election was stolen and those who wanted and intended to cause physical pain or injury to the officers protecting the Capitol that day. By all indications, Mr. Galetto falls into the former camp, rendering his actions nonviolent.

The Court should also reject the government's argument that Mr. Galetto is ineligible for the reduction merely by being present at the Capitol on January 6. *See* Dkt. 73 at 8. As this Court stated in *Hernandez*, while "it is clear that the insurrection as a whole was certainly violent . . . it is not the violence of others or general crowd violence that is the focus of this Court's inquiry." Dkt. 65 at 6, *United States v. Hernandez*, 21-cr-445 (CKK). Other judges in this jurisdiction have likewise rejected the government's "violence-by-presence theory of § 4C1.1(a)(3)." *Yang*, 2024 WL 519962, at *5 (rejecting the government's argument and "join[ing] the view of at least six other judges in this District," including Judges Kollar-Kotelly, McFadden, Friedrich, Mehta, Howell, and Boasberg).

13

Next, contrary to the government's suggestion, Dkt. 73 at 8-9, Mr. Galetto's decision to plead guilty to 18 U.S.C. §§ 111(a) and 231(a)(3) does not answer the question whether he "used violence." *See Yang*, 2024 WL 519962, at *2 (granting reduction in § 231(a)(3) case). The elements for each offense are listed in the plea agreement. *See* Dkt. 57 at 2-3. Neither requires the use of violence or an intention to cause harm. *See, e.g.*, *United States v. Mostofsky*, 579 F. Supp. 3d 9, 24 (D.D.C. 2021) (finding that § 231(a)(3) reaches beyond "only violent conduct"); *United States v. McHugh*, 583 F. Supp. 3d 1, 29 (D.D.C. 2022) (similar). In fact, the government should know that a § 231(a)(3) conviction does not require violent conduct because it has expressly stated that the offense "does not require a particular defendant to engage in acts of violence." *See* Gov't Opp'n to Mot. to Dismiss, *United States v. Mostofsky*, No. 21-cr-138 (JEB), Dkt. 57 at 48-49. The government has likewise argued that "Section 111 specifies neither that the offending conduct must be a 'felony' nor that it must be 'violent.'" *See* Gov't Opp'n to Mot. to Dismiss, *United States v. Camargo*, No. 21-cr-70 (ABJ), Dkt. 96 at 10). It would be inconsistent for the government to argue now that having these convictions alone is disqualifying under the violence factor in U.S.S.G. § 4C1.1(a)(3). Accordingly, the Court should look at Mr. Galetto's individual actions and intentions—not simply his statutes of conviction.[6]

---

[6] By way of comparison, numerous courts have concluded that § 111(a) is not a "crime of violence" under the Armed Career Criminal Act because there are ways of violating the statute that do not involve violent force. *See, e.g.*, *United States v. McDaniel*, 85

Finally, the government points to a handful of January 6 cases in which the court declined to apply U.S.S.G. § 4C1.1, relying most heavily on *United States v. Giberson*, No. 23-cr-115. *See* Dkt. 73 at 8-9 & n.2. In *Giberson*, Judge Nichols considered at sentencing (on the day § 4C1.1 went into effect) whether a January 6 defendant convicted under § 231(a)(3) was eligible for the reduction. *See Giberson* Sent'g Tr. at 2:18-19, 4:7-10.[7] The question was not thoroughly briefed (indeed, the defense did not brief it at all in its sentencing memorandum). *See* Dkt. 26 at 15-17 (Gov't Sent'g Memo), *United States v. Giberson*, No. 23-cr-115 (CJN); Dkt. 27 (Def's Sent'g Memo), *United States v. Giberson*, No. 23-cr-115 (CJN). During the hearing, Judge Nichols explained that "this is a very close question," but held that,

> by a preponderance of the evidence, the government has established that, while engaging in the collective pushing against the officers, Mr. Giberson used physical force against the officers that was capable of causing them physical pain or injury and that, through those pushing -- through pushing, he intended that the force would harm, seriously impact -- harm or at least seriously impact the officers.

*Giberson* Sent'g Tr. at 22:6-17. The Court eventually sentenced Mr. Giberson to two months' imprisonment and six months of home detention for violating § 231(a)(3). *Id.*

---

F.4th 176, 185 (4th Cir. 2023) ("Because § 111(a) can be violated with the use of any amount of force against a federal officer, it can be violated with less than violent force."); *United States v. Taylor*, 848 F.3d 476, 493 (1st Cir. 2017) ("We need not dwell on § 111(a). Battery is the prototypical overbroad crime because it can encompass behavior that is capable of causing physical pain or injury and conduct that is not, such as our shoulder-tapping example from above."); *United States v. Ama*, 684 F. App'x 736, 742 (10th Cir. 2017) (similar).

[7] While the *Giberson* transcript is not yet available on the public docket, undersigned counsel can provide the transcript to the Court at its request.

at 64:21-24.  Notably, the Court stated that "the guidelines range I announced earlier was somewhat of a close call because Mr. Giberson's conduct is probably on the lower end of what qualifies as violence under 4C1.1." *Id.* at 65:14-19.  In fact, Judge Nichols indicated that he would have given the same sentence even if the reduction did apply. *Id.* at 65:17-19.

Mr. Galetto's case is distinguishable on several grounds.  First, in *Giberson*, Judge Nichols concluded that the defendant intended his heave-ho efforts to harm or "seriously impact" the officers.  As laid out in this filing, to be considered "violent" Mr. Galetto must have intended to injure the officers, and the evidence presented here strongly suggests that he lacked such an intent.  Second, Mr. Giberson had chanted "drag them out," which the government interpreted as "meaning the rioters should drag the police out of the tunnel by force."  Dkt. 26 at 18.  Third, unlike Judge Nichols (who expressed some uncertainty about his decision), this Court has the benefit of fulsome briefing and months' worth of caselaw on this issue.  And here, this Court's decision could affect Mr. Galetto's sentence by months, whereas in *Giberson*, Judge Nichols was going to impose the same below-Guidelines sentence regardless.

The remainder of the government's cited cases bear little resemblance to Mr. Galetto's:

- *United States v. Dillard*, No. 23-cr-49 (JMC): According to the government's sentencing memorandum, Mr. Dillard "grabbed Officer B.A.'s protective vest from behind and threw Officer B.A. backwards to the marble floor below," causing Officer B.A. to "hit the marble floor with his head and shoulders before sliding into a metal bench."  Dkt. 35 at 15.  Then, "[s]econds after his assault on Officer B.A., Dillard approached USCP

Officer A.W.[,] . . . repeatedly shoved Officer A.W. away from the doors so that more rioters could enter," and "continued to harass him, sticking his fingers in Officer A.W.'s face[.]" *Id.* at 16-17. **Here, Mr. Galetto did not throw or shove an officer with the intent of causing injury.**

- *United States v. Hernandez*, No. 22-cr-42 (CRC): Judge Cooper held that § 4C1.1 did not apply in a minute order dated November 21, 2023. In that order, Judge Cooper explained that "Mr. Hernandez admitted that he 'joined in a group push against the officers' and that he 'hit officer B.A. on his riot helmet with the flagpole.'" **Here, Mr. Galetto did not strike any officers or use any weapons.**

- *United States v. Pavlik*, No. 23-cr-45 (TNM): According to the government's sentencing memorandum, Mr. Pavlik both used violence and possessed a dangerous weapon in connection with his offense (a separate exclusion under § 4C1.1(a)(7)) when he "pushed against officers in the Tunnel, prepared himself to spray officers, and handed a can of chemical spray to another rioter, who used it to spray officers in the Tunnel." Dkt. 116 at 13. **Here, Mr. Galetto neither possessed a weapon nor gave a weapon to another rioter to use against officers.**

- *United States v. Herrington*, No. 23-cr-199 (BAH): According to the government's sentencing memorandum, Mr. Herrington "hurled a 4 x 4 piece of lumber" at police officers, "picked up a section of bike rack and advanced towards officers," "threw smaller objects at [officers] like a water bottle and something he removed by vandalizing an electrical box," "shouted violent threats toward officers," and came to the Capitol with a "large military-style knife and a small stun gun on his person." Dkt. 24 at 2. **Here, Mr. Galetto did not use any weapons, strike any officers, or bring any weapons to the Capitol.**

In sum, because Mr. Galetto did not intend to harm any officers on January 6, § 4C1.1(a)(3) does not exclude him from the reduction. The government does not contend that any of the other exclusions apply here, and so Mr. Galetto is eligible for the relief sought in his motion.

### III.    The § 3553(a) factors weigh in favor of the reduction.

At Mr. Galetto's sentencing, this Court considered all of the § 3553(a) factors and concluded that a 27-month sentence—the middle of the guidelines range—was appropriate.  In reaching that decision, the Court balanced the seriousness of January 6 and Mr. Galetto's actions that day with numerous "positive considerations," including that Mr. Galetto accepted responsibility and pleaded guilty, is "an upstanding and contributing member of the community," had "no criminal history," was "fully compliant with release conditions," has "a strong work history," and has "been devoted to [his] family and [his wife] during her health issues."  Sept. Sent'g Tr. at 18:16-24.  His acceptance of responsibility was especially noteworthy: during his allocution, Mr. Galetto stated that "entering that tunnel was the stupidest thing [he's] ever done;" he "took full responsibility for [his] actions" and acknowledged that January 6 was "an unacceptable way to resolve political differences;" and that he "was wrong."  Aug. Sent'g Tr. at 30:25-31:1, 31:12-14, 34:10.

Since Mr. Galetto's sentencing, the only § 3553(a) factors that have materially changed are his applicable guidelines range and post-sentencing conduct, both of which strongly support the proposed 21-month sentence.  After applying the reduction, Mr. Galetto's range drops from 24-30 months to 18-24 months, making the new mid-range sentence 21 months.  Accordingly, if the Court agrees with Mr. Galetto that the reduction applies but imposes the same 27-month sentence anyways, the Court would actually be varying up when it found no reason to do so at the original

sentencing.  *See* Dkt. 70 at 3 (Statement of Reasons reflecting no basis for a variance); *cf. Molina-Martinez v. United States*, 578 U.S. 189, 200 (2016) ("[T]he Guidelines are not only the starting point for most federal sentencing proceedings but also the lodestar."); *United States v. Turner*, 548 F.3d 1094, 1099 (D.C. Cir. 2008) ("Practically speaking, applicable Sentencing Guidelines provide a starting point or 'anchor' for judges and are likely to influence the sentences judges impose.").

Additionally, in considering whether and to what degree a sentence reduction is warranted under Amendment 821, "[t]he court may consider post-sentencing conduct of the defendant that occurred after imposition of the term of imprisonment." U.S.S.G. § 1B1.10 app. n.1(B)(iii).  Mr. Galetto's post-sentencing conduct weighs heavily in favor of reducing his sentence in this case.  First, and most importantly, Mr. Galetto has no disciplinary record from his period of incarceration.  See Ex. A at 3; *cf.*, *United States v. Greene*, 516 F. Supp. 3d 1, 16 (D.D.C. 2021) ("It is not unusual for inmates to receive reprimands in the prison context.").  Instead, Mr. Galetto has used his period of incarceration in a positive manner.  For example, he has a job as a recreation orderly and has taken educational courses.  Ex. A at 4, 7.  And, demonstrative of Mr. Galetto's desire to make amends, he has fully paid off his restitution and special assessment fine (a total of $2,200).  Ex. A at 6.

The detailed release plan attached to his pro se motion further demonstrates Mr. Galetto's dedication to making the most of his time in prison and ensuring that he never engages in this type of behavior again.  See Dkt. 71 at 7-15.  Unlike many

January 6 defendants, Mr. Galetto has since recognized that the election was not stolen and that "excessive time consuming news and media . . . led to a polarization of [his] political views." *Id.* at 11. He acknowledged that his actions on January 6 were "reckless," that he "failed to manage [his] emotions and actions effectively that day," and that he "should have made better choices." *Id.* He "feel[s] a duty to make amends to the people of this country," and engage in "self-help and personal development" while serving his sentence. *Id.* at 12-14. And he included letters from two "accountability partners," his wife and his brother-in-law. *Id.* at 15, 19-20. This plan, along with his behavior in prison, demonstrates his commitment to true rehabilitation.

Finally, the proposed reduction is consistent with the need to protect the public from future crimes. In promulgating Amendment 821's zero-point offender provision, the Commission relied on studies of recidivism among federal offenders which found that "offenders with zero criminal history points have considerably lower recidivism rates than other offenders, including offenders with one criminal history point." United States Sentencing Commission, *Amendments to the Sentencing Guidelines* (Apr. 27, 2023), at 79.[8] Mr. Galetto's lack of any prior criminal history, along with

---

[8] Available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf.

his detailed release plan and deep remorse, strongly suggest that there is no need to protect the public from Mr. Galetto's actions going forward.[9]

## CONCLUSION

For these reasons, Mr. Galetto respectfully requests that his Court grant his motion and reduce his term of imprisonment to 21 months.

Respectfully Submitted,

A. J. KRAMER

Federal Public Defender for the District of Columbia

by:_____s/_____
Molly Runkle
Assistant Federal Public Defender
625 Indiana Avenue, NW
Washington D.C. 20004
202-208-7500
molly_runkle@fd.org

---

[9] The government theorizes, without evidence, that the Sentencing Commission's recidivism findings do not apply to January 6 defendants. *See* Dkt. 73 at 11. But, unlike some January 6 defendants, Mr. Galetto has acknowledged that the election was not stolen and that his actions on January 6 were wrong, suggesting that he is at a very low risk of recidivism. Additionally, Judge Bates correctly rejected this argument in *Yang* for three reasons: (1) "speculation about the underlying analysis behind a Guidelines amendment is not a valid basis to disregard the Guidelines as enacted;" (2) "[t]he Sentencing Commission (and Congress) had almost three years after January 6 to craft a carveout excluding January 6 defendants from § 4C1.1's potential benefit but did not do so;" and (3) "there is no indication that § 4C1.1's animating rationale does not hold true in this context—i.e., that despite the unprecedented nature of January 6, rioters with zero criminal history points who meet the other criteria may still be less likely to recidivate than those with prior criminal records."